## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED
PEOPLE; HAITIAN WOMEN FOR
HAITIAN REFUGEES; and THE
HAITIAN LAWYERS ASSOCIATION,
INC.,

*Plaintiffs,*

v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; ELAINE
COSTANZO DUKE, in her official
capacity; and KIRSTJEN NIELSEN, in her
official capacity,

*Defendants.*

Civil Action No. 18 Civ. 239 (MJG)

## FIRST AMENDED COMPLAINT

## PRELIMINARY STATEMENT

The National Association for the Advancement of Colored People ("NAACP"), Haitian

Women for Haitian Refugees ("HWHR"), and the Haitian Lawyers Association, Inc. ("HLA")

(collectively, "Plaintiffs") bring this action against the United States Department of Homeland

Security ("DHS"); Elaine C. Duke ("Defendant Duke") in her official capacity as former Acting

DHS Secretary; and Kirstjen Nielsen ("Defendant Nielsen") in her official capacity as the current

DHS Secretary. Plaintiffs seek to enjoin DHS's November 2017 decision to rescind Temporary

Protective Status ("TPS") for Haitian immigrants, as it reflects an egregious departure from the

TPS statute's requirements and an intent to discriminate on the basis of race and/or ethnicity.

On January 12, 2010, Haiti was struck by one of the deadliest earthquakes in modern

history. It killed hundreds of thousands of Haitians, left millions homeless, and nearly destroyed

Port-au-Prince, Haiti's capital.  Haiti's extensive recovery efforts have been hobbled by two additional large-scale catastrophes: the outbreak of cholera in October 2010 and a Category 4 hurricane in October 2016.  Each catastrophe exacerbated the dire situation created by the 2010 earthquake.

These extraordinary circumstances led to Haiti's 2010 TPS designation and to DHS's repeated extension of that designation over the last seven years.  TPS allowed eligible Haitians to remain in the United States without fear of deportation and to obtain work authorization. Nevertheless, despite persistent food insecurity, a housing shortage, and a cholera epidemic, and despite a formal extension request from the Haitian government and various American officials from across the political spectrum, DHS terminated TPS for Haitians in November 2017, with a delayed effective date of July 22, 2019.

As such, an estimated 58,000 Haitians with TPS may face deportation to a country that is ill-prepared to receive them.  The Haitian community is alarmed by the termination of TPS.  As Marleine Bastien, a South Florida Haitian activist explained, "Haiti is not ready to absorb 58,000. It's going to be a disaster for the 58,000 families in the U.S. and a disaster for Haiti."[1]  U.S. Senator Bill Nelson echoed that sentiment when he tweeted, "There is no reason to send 60,000 Haitians back to a country that cannot provide for them."[2]

DHS stated that the rescission decision followed an objective review of the conditions that supported the original designation.  For the reasons detailed below, DHS's explanation is demonstrably spurious.  Instead, DHS's true motive for terminating TPS for Haitians reflects racial

---

[1] Jacqueline Charles & Patricia Mazzei, *Haitian quake victims in the U.S. will lose deportation protection in 2019,* Miami Herald (Nov. 21, 2017), http://www.miamiherald.com/news/nation-world/world/americas/haiti/article185716193.html.
[2] Sen. Bill Nelson (@SenBillNelson), Twitter (Nov. 20, 2017, 4:41 PM), https://twitter.com/SenBillNelson/status/932770987644420098.

discrimination. In early 2017, DHS officials searched for evidence that Haitians in the United States were criminals and receiving public assistance. Those efforts were grounded in longstanding and particularly noxious anti-Black stereotypes. In fact, of the approximately 58,000 Haitian TPS recipients, 6,200 are part of a household with a mortgage. Their median household income is $45,000. Their labor force participation rate is 81 percent (the labor force participation rate for the total U.S. population is 63 percent). Ninety-six percent speak at least a little English and 75 percent speak English well, very well, or only English. Seventy-one percent have completed high school or more and 37 percent have some college or a college degree.[3] Unable to find evidence to support their discriminatory stereotypes, DHS's Acting Secretary ultimately offered pretextual rationales for rescinding TPS that failed to acknowledge—much less address— the ongoing conditions in Haiti that warranted extending that status.

DHS's actions are consistent with the Trump Administration's (the "Administration") larger, racialized goals concerning immigration. President Trump has long made clear his antipathy towards Latin American and Black immigrants, and his preference for white immigrants. In June 2017, upon learning that 15,000 Haitians and 40,000 Nigerians had received visas to enter the United States, the President reportedly exclaimed that Haitians "all have AIDS," and that, upon seeing the United States, Nigerians would never return to their "huts" in Africa. On January 11, 2018, during a meeting on immigration with several U.S. Senators, Secretary of State Rex W. Tillerson, White House Chief of Staff John F. Kelly, and Defendant Nielsen, the President stated that he did not want immigrants from African countries, which he derided as "shithole countries." The President also asked, "Why do we need more Haitians?" and directed that Haitian immigrants

---

[3] *See* Robert Warren & Donald Kerwin, *A Statistical and Demographic Profile of the US Temporary Protected Status Population from El Salvador, Honduras, and Haiti,* 5 J. on Migration and Hum. Sec. 577, 583 (Aug. 2017), http://cmsny.org/publications/jmhs-tps-elsalvador-honduras-haiti/.

should not be admitted through any proposed immigration plan. In stark contrast, the President stated that immigrants from countries "like Norway" were more desirable and should be admitted. As Senator Richard Durbin pointed out during the meeting, President Trump's singling out Haitians for exclusion was "an obvious racial decision."

President Trump's racial bias against Haitian immigrants recalls America's long, ignominious history of discrimination against Haiti, the world's first Black republic. In August 1791, slaves in northern Haiti launched the largest slave revolt in history.[4] Within two years, every slave in the colony was free. The Haitian Revolution terrified many in the U.S. government, which refused to recognize Haiti's independence for decades.[5] American consternation reflected the fact that Haiti's leaders were Black and, from the perspective of the U.S. Government, embodied an explosive message. That discrimination by the United States has endured and includes several successful challenges in the 1980s and 1990s to federal policies surrounding the discriminatory treatment of Haitian immigrants. That discrimination also includes a double standard the United States exhibits towards Haitian and Cuban immigrants.

President Trump has made clear that he wishes to reduce the number of immigrants of color to the United States. The rescission of Haiti's TPS is part of that agenda. DHS's decision to rescind Haiti's TPS designation was infected with the intention to discriminate on the basis of race and/or ethnicity, in violation of the Fifth Amendment.

## **PARTIES**

1.    The National Association for the Advancement of Colored People is the nation's largest and oldest civil rights grassroots organization. Since its founding in 1909, the mission of the NAACP has been to ensure the political, educational, social, and economic equality of all

---

[4] *See* Laurent Dubois, *Haiti: The Aftershocks of History* 22-51 (Metropolitan Books 2012).
[5] *Id.*

persons and to eliminate race-based discrimination. The NAACP has fought in the courts for decades to protect the constitutional guarantee of equal protection under law. To advance its mission, the NAACP has brought landmark civil rights cases over its 109-year history and continues to do so. The NAACP also has filed numerous *amicus* briefs in cases that significantly impact people of color. The NAACP's membership includes Haitian TPS beneficiaries. The NAACP brings this action on behalf of those members, including but not limited to Marie Farah Larrieux, a Haitian TPS recipient living in South Florida.

2.     Haitian Women for Haitian Refugees is a not-for-profit corporation based in New York and formed for the charitable and educational purposes of assisting Haitian immigrants and refugees in the United States. HWHR has approximately 40 active members, some of whom are TPS recipients. HWHR's members participate in monthly meetings and help to organize HWHR's activities. Approximately twelve members also sit on HWHR's steering committees to organize HWHR's campaigns.

3.     In furtherance of these purposes, HWHR offers weekly classes in literacy and English. HWHR also assists Haitian domestic violence survivors with immigration concerns to secure legal services and mental health counseling. HWHR also works to address the legal needs of Haitian immigrants by, for instance, organizing legal clinics and providing legal referrals.

4.     Defendants have caused and continue to cause HWHR to divert its modest financial, personnel, and other organizational resources away from these existing programs to counteract Defendants' discriminatory TPS rescission decision. In particular, HWHR has had to field calls from distressed TPS recipients who are worried about, *inter alia,* being deported to a country that is unprepared to receive them; losing their authorization to work in the United States; losing their medical coverage; losing their eligibility for college financial assistance; interrupting

their education; and being separated from their close family members, including their American-born children. Defendants' rescission decision also caused HWHR to create a TPS Committee and organize legal clinics to address the immediate needs of its constituents with TPS, including those who worried about termination of employment if they were unable to demonstrate to their employers that they would be authorized to work in the United States after January 2018.

5.      In particular, prior to May 2017 (when Secretary Kelly first indicated that rescission was likely), HWHR devoted its organizational resources concerning legal clinics and referrals to Haitian immigrants who entered the United States on humanitarian parole.[6] Since Secretary Kelly's announcement in May 2017, HWHR has had to shift those resources and instead make the focus of its legal clinics and referrals individuals who benefit from TPS.

6.      HWHR brings this action on behalf of itself and its constituents and/or members with TPS, who are the direct subject of Defendants' discriminatory rescission decision.

7.      The Haitian Lawyer's Association, Inc. is a not-for-profit voluntary bar association and legal organization in Florida. HLA was founded in 1996 and its members are primarily Haitian-American and Haitian lawyers, law professors, law students and judges.

8.      HLA's mission is to foster and encourage professional excellence among Haitian-American Lawyers; increase the law school enrollment of Haitian-Americans and other minorities; and promote, protect, and advocate for the civil rights of the Haitian-American and Haitian community, among other goals.

---

[6] The Secretary of Homeland Security may grant humanitarian parole to otherwise inadmissible individuals in emergency situations. After the 2010 earthquake, humanitarian parole enabled more than 1,000 Haitian orphans to join their adoptive parents in the United States. Since 2015, DHS has granted humanitarian parole to certain Haitians waiting to be reunited with family in the United States, pursuant to the Haitian Family Reunification Parole Program ("HFRP").

9.      In furtherance of these purposes, HLA advocated on behalf of Haitians who were deported from the Dominican Republic due to a change in their immigration status in 2013; sought to address the problems associated with the cholera outbreak in Haiti; and, from 2010 to 2015, helped to process TPS applications for Haitian immigrants living in the United States through legal clinics.

10.      Defendants' decision to rescind TPS has caused and continues to cause HLA to divert its modest financial, personnel, and other organizational resources away from these existing programs to counteract Defendants' racially discriminatory decision.  In response to Secretary Kelly's May 2017 announcement that Haitian TPS recipients should begin preparing to return to Haiti, and then in response to the November 2017 announcement that TPS for Haitians would be rescinded, HLA has diverted resources away from other advocacy efforts to assist Haitian TPS recipients by (1) assessing whom among its constituency requires an adjustment of immigration status; (2) helping to educate members, TPS recipients, and the general public about Defendants' decision to rescind TPS by, among other things, holding legal clinics, paying for radio advertising, and creating and paying for the copying and distribution of informational flyers; (3) establishing a hotline to address TPS recipients' questions, staffing the hotline, and paying members to staff the hotline; and (4) otherwise organizing and petitioning to mitigate the effects of Defendants' decision to rescind TPS.

11.      Defendant Department of Homeland Security is a Department of the Executive Branch of the United States Government and an agency within the meaning of 5 U.S.C. § 551. DHS and its component agencies, the U.S. Citizenship and Immigration Services ("USCIS"), U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement

("ICE"), are responsible for, *inter alia*, administering and enforcing American immigration laws and policies, including the TPS program.

12.     Defendant Elaine Costanzo Duke was Acting Secretary of Homeland Security from on or about July 31, 2017, until on or about December 6, 2017.  Defendant Duke currently serves as the Deputy Secretary of DHS.  As Acting Secretary, Defendant Duke was responsible for overseeing DHS and for implementing and enforcing America's immigration laws.  Defendant Duke authorized rescission of the Republic of Haiti's designation for TPS ("Haitian TPS") on or about November 20, 2017.  She is sued in her official capacity.

13.     Defendant Kirstjen Nielsen has been Secretary of Homeland Security since on or about December 6, 2017 and is the senior official at DHS.  Defendant Nielsen is responsible for overseeing DHS and for implementing and enforcing American immigration laws, including TPS.  Defendant Nielsen is sued in her official capacity.

## JURISDICTION AND VENUE

14.     Jurisdiction is conferred on this Court by 28 U.S.C. § 1331.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

## FACTS

*Temporary Protected Status*

16.     When civil unrest, violence, or natural disasters erupt in countries around the world, concerns arise about the ability of foreign nationals in the United States from those countries to safely return.  Section 244(c)(2) of the Immigration and Nationality Act ("INA") and 8 U.S.C. § 1254a, therefore, provide for TPS when the Secretary of Homeland Security[7] finds that

---

[7] Under 8 U.S.C. § 1254a, the Attorney General was authorized to administer the TPS program.  The authority to designate countries and administer the TPS program was transferred from the Attorney General to the Secretary of Homeland Security in 2003, with the formation of the Department of Homeland Security.  Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002).

conditions in the country temporarily prevent nationals from returning safely or, in certain circumstances, where the country is unable to adequately handle the return of nationals.

17.     Foreign nationals protected by TPS cannot be removed from the United States during the period in which the status is in effect.  A foreign national who is granted TPS receives a registration document and work authorization.  When TPS is terminated, the foreign national's immigration status reverts to her status prior to the TPS grant.

18.     The Secretary of Homeland Security may grant TPS protections to foreign nationals if she determines that, *inter alia*, (a) there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the foreign state resulting in a substantial, but temporary, disruption of living conditions in the area affected; the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state; and the foreign state officially has requested TPS designation; or (b) there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety.

19.     The Secretary of Homeland Security has discretion to issue TPS for periods of six to 18 months.  Thereafter, the Secretary must review the conditions in the foreign state for which the designation is in effect and must determine whether the conditions for such designation continue to be met.  If the Secretary does not determine that a foreign state no longer meets the conditions for designation under the TPS statute, the period of designation may be extended for up to 18 months.  If the Secretary determines that the foreign state no longer continues to meet the conditions for designation under the statute, she must terminate the designation.

20.     The Secretary's decision—whether to renew or rescind TPS—must be published in the Federal Register on a timely basis.  The timing of that publication has important consequences

for TPS recipients because their employment authorization and other authorization documents expire when their TPS expires.

*DHS Grants TPS for Haiti in 2010 and, After Careful Assessments of Conditions in Haiti, Repeatedly Extends TPS Through 2017*

21.     On January 15, 2010, then-Secretary of Homeland Security Janet Napolitano announced that the designation of TPS for Haitian nationals who were in the United States as of January 12, 2010, would last 18 months.[8]  The designation was published in the Federal Register just six days later, on January 21, 2010.

22.     Secretary Napolitano designated Haiti for TPS because the "earthquake destroyed most of the capital city," and initial estimates indicated that the "death toll [was] substantial."[9] The International Red Cross estimated that one-third of Haiti's population—about three million people—were affected by the earthquake. Government buildings, including the Presidential Palace, the Ministry of Justice, and Parliament, were destroyed or damaged, as were hospitals and schools.  Haiti's critical infrastructure, including electricity, water, and telephone services, was severely affected.  The Secretary also noted the limited access to Port-au-Prince because roads were blocked by debris, a major bridge had collapsed, and Haiti's main airport was damaged.  This hindered the ability to transport food, fresh water, and medical supplies to those affected.  Secretary Napolitano found that Haiti has "limited resources to cope with a natural disaster, and now has been struck by its strongest earthquake in 200 years," and "the magnitude of the disaster is

---

[8] *See* Press Release, Statement from Homeland Sec'y Janet Napolitano on Temporary Protected Status (TPS) for Haitian Nationals (Jan. 15, 2010), https://www.dhs.gov/news/2010/01/15/secretary-napolitano-temporary-protected-status-tps-haitian-nationals.
[9] Designation of Haiti for Temporary Protected Status, 75 Fed. Reg. 3,476, 3,477 (Jan. 21, 2010).

substantial."[10] As such, the Secretary determined that "there clearly exist extraordinary and temporary conditions preventing Haitian nationals from returning to Haiti in safety."[11]

23.    On May 17, 2011, Secretary Napolitano extended Haitian TPS for an additional 18 months. The extension was published in the Federal Register just two days later, on May 19, 2011. The Secretary determined that, since the initial designation, DHS and the Department of State had reviewed conditions in Haiti and determined that it was warranted to "extend[ ] the existing designation of Haiti for [TPS] for 18 months from July 23, 2011 through January 22, 2013, and redesignat[e] Haiti for TPS for 18 months, effective July 23, 2011 through January 22, 2013."[12]

24.    In extending Haitian TPS, Secretary Napolitano noted that the "earthquake has exacerbated Haiti's position as the least-developed country in the Western Hemisphere and one of the poorest in the world."[13] She also noted that, according to the Central Intelligence Agency World Factbook, as of September 22, 2010, 80 percent of Haiti's population was living below the poverty line. Due to this widespread poverty, the Government of Haiti was unable to collect sufficient revenue to provide adequate social services and to invest in physical and human capital.

25.    Secretary Napolitano further noted that an estimated "230,000 people died and approximately three million were affected by the earthquake. In total more than one million Haitians have been left homeless and are currently living in temporary camps."[14] After an assessment for habitability of approximately 300,000 of the estimated 350,000 to 400,000 buildings destroyed by the earthquake, the Haitian government and international nongovernmental organizations concluded that approximately 21 percent of those buildings were unsafe and required

---

[10] *Id.*

[11] *Id.*

[12] Extension and Redesignation of Haiti for Temporary Protected Status, 76 Fed. Reg. 29,000, 29,000 (May 19, 2011).

[13] *Id.* at 29,001.

[14] *Id.*

major repairs or demolition.[15]   The Department of State estimated that there were approximately 1,300 camps for internally displaced persons in Haiti.  According to the United Nations Children's Fund, there were approximately 1.6 million internally displaced persons in Haiti, approximately 800,000 of whom were children.  The camps were "extremely crowded and [ ] vulnerable to flooding, crime (including gender-based violence), and disease."[16]

26.    In October 2010, the first modern, large-scale outbreak of cholera occurred in Haiti when United Nations soldiers introduced the disease to the island.  Secretary Napolitano also recognized the cholera outbreak as evidence of the "vulnerability of the public health sector of Haiti."  The Haitian Ministry of Public Health and Population reported "199,497 cholera cases, including 112,656 hospitalizations and 3,927 deaths."[17]

27.    These factors and "consultation with the appropriate Government agencies" led Secretary Napolitano to conclude that the "conditions that prompted the January 21, 2010 designation of Haiti for TPS continue to be met."[18] Secretary Napolitano extended Haiti's TPS designation for 18 months, until January 22, 2013.

28.    On October 1, 2012, Secretary Napolitano extended Haiti's TPS for another 18 months, from January 23, 2013, through July 22, 2014.[19] The Secretary noted that "Haitian government estimates of the death toll caused by the earthquake have ranged from 230,000 to over 300,000 people.  The Government of Haiti further estimated that more than 1,000,000 people were displaced within the Port-au-Prince metropolitan area."[20]

---

[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.* at 29,001, 29,002.
[19] Extension of the Designation of Haiti for Temporary Protected Status, 77 Fed. Reg. 59,943, 59,943 (Oct. 1, 2012).
[20] *Id.* at 59,944.

29.     Secretary Napolitano noted that security in Haiti remained a concern because the earthquake "killed 77 officers of the Haitian National Police (HNP), injured 253 officers, and destroyed or severely damaged 45 HNP stations and substations."[21] Secretary Napolitano also considered the "[p]olitical instability" of the Government of Haiti, and its inability to "fully engage in development decisions."[22]

30.     She further considered that "approximately 500,000 people continued to live in … camps, which are vulnerable to flooding, disease, crime, and gender-based violence.  Alternative housing options are lacking . . . [The] level of displacement, scale of the damage, low funding and the lack of a government housing reconstruction policy impeded reconstruction efforts in Haiti."[23]

31.     Secretary Napolitano additionally considered Haiti's public health problems, including the steady rains in October 2010 that led to flooding and contributed to the deadly cholera outbreak.  She found that "as of May 1, 2012, there have been an estimated 532,192 cholera cases and 7,060 associated deaths since October 2010."[24] Secretary Napolitano noted that, despite significant progress, food security continued to be a problem.  She also noted that "80 percent of the schools west of the capital were destroyed or severely damaged in the earthquake."[25]  The Haitian government estimated that "35 to 40 percent of schools in the southeast were destroyed, rendering the total number of schools destroyed or severely damaged as high as 5,000."[26]

32.     Secretary Napolitano concluded that while the situation in Haiti has improved, "[g]iven the risk of contracting cholera, unsafe living conditions in [internally displaced persons]

---

[21] *Id.*
[22] *Id.*
[23] *Id*.
[24] *Id*.
[25] *Id*.
[26] *Id.* at 59,944-45.

camps, damaged infrastructure, and a shortage of permanent shelter, it is unsafe for Haitians currently in the United States with TPS to return home."[27]

33.    On March 3, 2014, then-Secretary Jeh Johnson extended the designation of Haiti for TPS for 18 months, from July 23, 2014, through January 22, 2016.  Secretary Johnson stated that "[w]hile the Government of Haiti has made considerable progress in improving the security and quality of life of its citizens following the January 2010 earthquake, Haiti continues to lack the adequate infrastructure, employment and educational opportunities, and basic services to absorb the approximately 58,000 Haitian nationals living in the United States under TPS."[28]

34.    Secretary Johnson further noted that the earthquake impacted the "governance and the rule of law" in Haiti.  Secretary Johnson stated that the earthquake "exacerbated pre-existing vulnerabilities, including gender-based violence, trafficking, sexual exploitation, child labor, domestic violence, and recruitment into crime or violence."[29]   The United Nations Security Council voted to extend the peacekeeping mission in Haiti until mid-October 2014 so that it could further contribute to the country's stability and development.

35.    In addition, Secretary Johnson found that 40 percent of Haiti's population lacked access to basic health services, which contributed to a rise in new cholera infections.

36.    Secretary Johnson also recognized that the Haitian economy, devastated by the 2010 earthquake, was further adversely affected by Tropical Storm Isaac and Hurricane Sandy.  At the time, Haiti's unemployment rate was approximately 40 percent.  More than 78 percent of Haitians lived on fewer than $2 per day, and over 50 percent lived on fewer than $1 per day.  In rural areas, 88 percent of individuals lived below the poverty line and basic services were

---

[27] *Id.* at 59,945.
[28] Extension of the Designation of Haiti for Temporary Protected Status, 79 Fed. Reg. 11,808, 11,809 (Mar. 3, 2014).
[29] *Id*. at 11,809, 11,810.

practically nonexistent.  As of September 2013, approximately 172,000 individuals remained in camps.

37.    For these reasons, Secretary Johnson extended Haiti's TPS designation for another 18 months, through January 22, 2016.

38.    On August 25, 2015, Secretary Johnson extended Haiti's TPS designation for another 18 months, from January 23, 2016, through July 22, 2017.[30]

39.    Secretary Johnson extended Haiti's TPS after carefully reviewing Haiti's circumstances since the 2010 earthquake and consulting with the Department of State.  Secretary Johnson determined that an extension was warranted because the "extraordinary and temporary conditions that led to Haiti's designations continue to exist and prevent Haitian nationals . . . from returning to Haiti in safety."[31] The Secretary found that there remained "a housing shortage, a cholera epidemic, limited access to medical care, damage to the economy, political instability, security risks, limited access to food and water, a heightened vulnerability of women and children, and environmental risks."[32]

40.    As to physical infrastructure and facilities, Secretary Johnson relied on the Haitian government's estimates that "105,000 houses were destroyed and 188,383 houses collapsed or suffered considerable damage."[33]  Secretary Johnson noted that while there had been improvements to road conditions and most of the earthquake-related rubble had been cleared, "the effort to rebuild damaged buildings has been slow.  Virtually all government offices and ministries

---

[30] Extension of the Designation of Haiti for Temporary Protected Status, 80 Fed. Reg. 51,582, 51,582 (Aug. 25, 2015).
[31] *Id.* at 51,583.
[32] *Id.*
[33] *Id.*

were destroyed in downtown Port-au-Prince and, 5 years later, remain housed in temporary facilities."[34]

41.     Secretary Johnson also relied on the International Organization for Migration's December 2014 report, which estimated that 80,000 internally displaced Haitians still lived in approximately 105 camps.  Most of the camps lacked waste management services and adequate sanitation facilities, which contributed to a high risk of cholera transmission and malnutrition rates that exceeded emergency thresholds.[35]  The Secretary was also concerned about the persistent gender-based violence in the settlements.  The Secretary also found that Haiti lacked "sufficient housing units to address its pre-earthquake shortage, replace damaged or destroyed units, and satisfy projected urban growth.  Some Haitians have returned to unsafe homes or built houses in informal settlements located in hazardous areas without access to basic services."[36]

42.     Haiti's compromised infrastructure also compromised its food security.  Secretary Johnson found that, since the earthquake, an "estimated 2.5 million people are unable to cover their basic food needs and a January 2015 United Nations report estimated that over 600,000 people were facing severe food insecurity."[37]

43.     Secretary Johnson also recognized that Haiti's public health challenges were exacerbated by the earthquake and the outbreak of "the largest cholera epidemic in the Western Hemisphere."[38]  Secretary Johnson found that, as of December 2014, the cholera epidemic had affected approximately 725,000 people and claimed over 8,800 lives in Haiti since October 2010. In January 2015, the U.S. Centers for Disease Control and Prevention stated that outbreaks of

---

[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] *Id.*

epidemic diseases still occur, and that progress has been slow and limited in restoring Haiti's physical health infrastructure.[39]

44.    Secretary Johnson also recognized that the political instability in Haiti compromised its recovery efforts.  The earthquake killed approximately 18 percent of Haiti's civil servants and destroyed key government infrastructure, including the National Police headquarters and various judicial facilities.  Moreover, when local and parliamentary mandates expired on January 12, 2015, "Haiti was left without a functioning legislative branch or duly elected local authorities," which led to violent protests and demonstrations.[40]

45.    As such, and after consulting with "appropriate Government agencies," Secretary Johnson concluded that, although Haiti "has taken significant steps to improve stability and the quality of life for Haitian citizens, Haiti continues to lack the adequate infrastructure, health and sanitation services, and emergency response capacity necessary to ensure the personal safety of Haitian nationals."[41]

46.    In December 2016, the USCIS concluded that "[m]any of the conditions prompting the original January 2010 TPS designation persist, including a housing shortage, a cholera epidemic and limited access to medical care, damage to the economy (including extensive damage to Haiti's physical infrastructure), political instability, security risks, food insecurity, and environmental risks."[42]  On December 12, 2016, then-Secretary of State John F. Kerry warned that "[s]pecific lingering effects of the 2010 earthquake remain in infrastructure, health, sanitation services, and emergency response capacity," and recommended that DHS extend the designation

---

[39] *Id.*
[40] *Id.* at 51,584.
[41] *Id.*
[42] *TPS Considerations: Haiti* at 1, U.S. Citizenship and Immigration Servs. (Dec. 2016), http://www.ijdh.org/wp-content/uploads/2016/10/Haiti_TPS_StateDept-Dec2016-HaitiMemo.pdf.

of TPS for Haiti upon expiration in July 2017.[43]  Secretary Kerry explained that "[t]he Government of Haiti would have serious problems shouldering the responsibility for facilitating the reintegration of approximately 59,000 Haitian nationals when the Haiti TPS program would otherwise expire in 2017."[44]

*Lawmakers and Media Outlets Recognize that Conditions in Haiti Continue to Warrant TPS*

     47.    These repeated statements by executive officials that conditions in Haiti continue to warrant TPS are consistent with the contemporaneous assessments of editorial boards and bipartisan groups of lawmakers across the country.

     48.    On October 7, 2016, the *New York Times* editorial board reported that Hurricane Matthew ravaged Southwestern Haiti and flattened about 80 percent of the buildings in the city of Jérémie, and estimated that the nationwide death toll was in the hundreds.  The editorial board called on DHS to "immediately reinstitute temporary protected status for Haitians in the United States, and suspend efforts to deport unauthorized immigrants back to the disaster zone."[45]  Many additional editorial boards recognized that conditions in Haiti continued to militate for an extension of TPS.[46]

---

[43] Letter from John F. Kerry, Sec'y of State, to Hon. Jeh Johnson, Sec'y of DHS at 1 (Dec. 12, 2016), attachment to *TPS Considerations: Haiti, supra* note 42.
[44] *Department of State Recommendations Regarding Extension of Temporary Protected Status (TPS) for Haiti* at 4, U.S. Dep't of State (Nov. 9, 2016), attachment to Letter from Kerry to Johnson, *supra* note 43.
[45] Editorial Board, *Haiti's New Catastrophe*, N.Y. Times (Oct. 7, 2016),
https://www.nytimes.com/2016/10/08/opinion/haitis-new-catastrophe.html?_r=1.
[46] Editorial Board, *Extend Temporary Protected Status for eligible Haitians,* Miami Herald (Apr. 16, 2017),
http://www.miamiherald.com/opinion/editorials/article144888619.html;
Editorial, *Let them stay: U.S. must show compassion to threatened Haitians,* N.Y. Daily News (Apr. 22, 2017),
http://www.nydailynews.com/opinion/stay-america-show-compassion-threatened-haitian-article-1.3087734;
Editorial Board, *The United States may be about to inflict a massive hardship on Haiti*, Wash. Post (Apr. 22, 2017),
https://www.washingtonpost.com/opinions/the-united-states-may-be-about-to-inflict-a-massive-hardship-on-haiti/2017/04/22/a0741cb2-26ad-11e7-bb9d-8cd6118e1409_story.html?utm_term=.9d11b8771a30;
Editorial Board, *Extend protection for Haitian immigrants*, Sun Sentinel (Apr. 18, 2017), http://www.sun-sentinel.com/opinion/editorials/fl-editorial-haiti-tps-20170418-story.html;
Editorial, *Renew protected status for Haitians*, Bos. Globe (Apr. 24, 2017),
http://www.bostonglobe.com/opinion/editorials/2017/04/24/renew-protected-status-for-haitians/naGVEd8TT1afpqiEGVEGZN/story.html#comments;

49.    On March 14, 2017, Congresswoman Mia B. Love urged DHS to extend Haiti's TPS because conditions in Haiti warrant it.[47]  She wrote that "[t]his would enable TPS beneficiaries to thrive while Haiti builds its capacity to support them in the future."[48]  On March 24, 2017, Senators Charles E. Schumer and Kirsten Gillibrand urged DHS to extend Haitian TPS because they did "not believe it is safe or humane to deport non-violent Haitian nationals back to Haiti at this time."[49]  Also on March 24, 2017, Congressman Alcee L. Hastings and Senators Marco Rubio and Bill Nelson, joined by seven U.S. Representatives from Florida (three Republican and four Democrats), wrote that TPS remained necessary because "Haiti continues its efforts to rebuild from the 2010, 7.0 magnitude earthquake, and recover from the Cholera outbreak of the same year."[50]  On April 17, 2017, national Catholic leaders urged DHS to extend the TPS designation because "Haiti is in no position to accommodate the return on the estimated 58,000 Haitians who have received TPS from the United States.  Doing so would undoubtedly destabilize the small nation and potentially bring harm to those returned."[51]   On April 18, 2017, Senator Edward J.

---

Editorial Board, *Don't Send 50,000 Back to Fragile Haiti*, N.Y. Times (Apr. 29, 2017), https://mobile.nytimes.com/2017/04/29/opinion/sunday/dont-send-50000-back-to-fragile-haiti.html?referer=https://t.co/nHyQvUmaAG;
Editorial, *Extend protected status for eligible Haitians,* Palm Beach Post (May 9, 2017), https://www.mypalmbeachpost.com/news/opinion/editorial-extend-protected-status-for-eligible-haitians/ZvYTuHaGehHIOQCiIEYnuO/;
Editorial, *Hanging Haitians out to dry*, N.Y. Daily News (May 10, 2017), http://www.nydailynews.com/opinion/hanging-haitians-dry-article-1.3151165;
Editorial, *An easy call on Haiti for Trump – just heed Florida's advice*, Orlando Sentinel (May 19. 2017), http://www.orlandosentinel.com/opinion/os-ed-extend-deportation-protections-for-haitians-20170518-story.html.
[47] Letter from Cong. Mia B. Love to Pres. Barack Obama (Mar. 14, 2017), http://www.ijdh.org/wp-content/uploads/2016/10/Rep.-Mia-Love-TPS-Letter.pdf.
[48] *Id.*
[49] Letter from Sens. Charles E. Schumer & Kirsten Gillibrand to John F. Kelly, Sec'y of DHS & Rex Tillerson, Sec'y of State (Mar. 24, 2017), https://www.gillibrand.senate.gov/imo/media/doc/Letter%20to%20DHS%20and%20State%20re%20Haitian%20TPS%203.24.17.pdf.
[50] Letter from Cong. Alcee L. Hastings, et al. to John F. Kelly, Sec'y of DHS (Mar. 24, 2017), http://www.ijdh.org/wp-content/uploads/2017/03/Haiti-TPS-Letter.pdf.
[51] Letter from Catholic Leaders to John F. Kelly, Sec'y of DHS (Apr. 17, 2017), http://www.ijdh.org/wp-content/uploads/2016/10/Catholic-Partners-TPS-Haiti-Letter-4.17.17-FINAL.pdf; *see also* Letter from Faith-Based Organizations and Faith Leaders to John F. Kelly, Sec'y of DHS (May 1, 2017), http://www.ijdh.org/wp-content/uploads/2016/10/Haiti-TPS-Extension-Interfaith-Ltr-to-Sec-Kelly-1-May-2017.pdf.

Markey encouraged an extension.[52]   Sixteen U.S. Senators encouraged an extension on April 26, 2017;[53] as did the entire bipartisan delegation of the Congressional Black Caucus from the U.S. House of Representatives on May 2, 2017;[54] all 11 members of the Massachusetts congressional delegation on May 4, 2017;[55] 13 members of New York's congressional delegation on May 5, 2017;[56] the Broward County Board of County Commissioners on May 9, 2017;[57] Boston Mayor Martin J. Walsh[58] and Republican Homeland Security Committee Chairman Rep. Dan Donovan on May 11, 2017;[59] the mayors of 14 cities on May 17, 2017, including Boston, Chicago, Los Angeles, Miami, New York, Philadelphia, and Washington, D.C.;[60] and Senate Foreign Relations Committee Ranking Member Senator Ben Cardin on May 18, 2017.[61]

50.    On May 8, 2017, the Haitian government informed DHS that Haiti could not support the return of Haitian nationals with TPS, and worried that "[a] sudden repatriation of tens of thousands of Haitians will give rise to instability in Haiti." [62]   The Haitian government also

---

[52] Letter from Sen. Edward J. Markey to John F. Kelly, Sec'y of DHS (Apr. 18, 2017), http://www.ijdh.org/wp-content/uploads/2016/10/17-04-18-EJM-Letter-to-DHS-re-Haiti-TPS.pdf.

[53] Letter from Sens. Robert Menendez, et al. to John F. Kelly, Sec'y of DHS & Rex Tillerson, Sec'y of State (Apr. 26, 2017), http://www.ijdh.org/wp-content/uploads/2016/10/Joint-Letter-to-State-and-DHS-Haiti-TPS-4.26.17.pdf.

[54] Letter from Cong. Yvette D. Clarke & Cong. Black Caucus to John F. Kelly, Sec'y of DHS (May 2, 2017), https://clarke.house.gov/congresswoman-clarke-congressional-black-caucus-call-dhs-secretary-kelly-extend-temporary-protected-status-haitian-nationals/.

[55] Letter from Mass. Cong. Delegation to John F. Kelly, Sec'y of DHS (May 4, 2017), http://www.ijdh.org/wp-content/uploads/2016/10/Mass-Delegation-Letter-to-DHS-Sec-Kelly-on-Haiti-TPS.pdf.

[56] Letter from N.Y. Cong. Delegation to John F. Kelly, Sec'y of DHS & Rex Tillerson, Sec'y of State (May 5, 2017), http://www.ijdh.org/wp-content/uploads/2016/10/NewYorkCongressionalDelegationaHaiti-TPS-letter.pdf.

[57] Letter from Broward Cty. Comm'rs to John F. Kelly, Sec'y of DHS (May 9, 2017), http://www.ijdh.org/wp-content/uploads/2016/10/BrowardCounty_TPSLetter.pdf.

[58] Letter from Bos. Mayor Martin Walsh to John F. Kelly, Sec'y of DHS (May 11, 2017), http://www.ijdh.org/wp-content/uploads/2016/10/Boston-Mayor-Martin-Walsh.pdf.

[59] Letter from Cong. Daniel Donovan to John F. Kelly, Sec'y of DHS & Rex Tillerson, Sec'y of State (May 11, 2017), http://www.ijdh.org/wp-content/uploads/2016/10/RepDonavanSupportTPSExtension4Haiti.pdf.

[60]Letter from Martin J. Walsh, Mayor of Boston, et al. to John F. Kelly, Sec'y of DHS & Rex Tillerson, Sec'y of State (May 17, 2017), https://d3n8a8pro7vhmx.cloudfront.net/citiesforaction/pages/259/attachments/original/1495035467/TPS_sign_on_letter.pdf?1495035467.

[61] Letter from Sen. Benjamin L. Cardin, Ranking Member Comm. on Foreign Relations, to John F. Kelly, Sec'y of DHS & Rex Tillerson, Sec'y of State (May 18, 2017), http://www.ijdh.org/wp-content/uploads/2016/10/5-18-17-BLC-letter-to-Tillerson-and-Kelly-on-Haiti-TPS.pdf.

[62] Letter from Paul G. Altidor, Haitian Ambassador to the United States, to John F. Kelly, Sec'y of DHS (May 8, 2017), http://www.ijdh.org/wp-content/uploads/2016/10/The-Honorable-Secretary-John-F.-Kelly.pdf.

worried that "a sudden repatriation of Haitians living under this status will cause further hardship to Haiti and effectively derail our rebuilding efforts."[63]

*Secretary Kelly Extends Haitian TPS for Six Months but Informs Recipients to Prepare to Leave the United States.*

51.    On May 22, 2017, then-DHS Secretary Kelly[64] extended Haiti's TPS for six months, from July 23, 2017, through January 22, 2018.  Secretary Kelly published the extension in the Federal Register two days later, on May 24, 2017.[65]

52.    Secretary Kelly noted that 96 percent of the people displaced by the earthquake and living in camps had left those camps, and 98 percent of the internally displaced persons camps had been closed.  Nonetheless, Secretary Kelly noted, "over 55,000 Haitians who lost their homes in the earthquake are still living in 31 camps for internally displaced persons without viable options to leave."[66]  Secretary Kelly also noted that gender-based violence continues to be a serious and pervasive issue, and that those who are no longer in camps "have moved back to unsafe homes or relocated to informal settlements located in hazardous areas."[67]

53.    Moreover, Secretary Kelly determined that Hurricane Matthew caused extensive "damage to crops, housing, livestock, and infrastructure across Haiti's southwest peninsula" when it made landfall on October 4, 2016.  This hurricane impacted the entire country.[68]  In April 2017, heavy rains caused flooding and landslides in Haiti's southern department.  Secretary Kelly concluded that the damage from Hurricane Matthew and the heavy rains compounded "the existing

---

[63] *Id.*
[64] Secretary Kelly became White House Chief of Staff on July 28, 2017.
[65] Extension of the Designation of Haiti for Temporary Protected Status, 82 Fed. Reg. 23,830, 23,830 (May 24, 2017).
[66] *Id.* at 23,832.
[67] *Id.*
[68] *Id.*

food insecurity experienced by an estimated 3.2 million people (approximately 30 percent of the population) in September 2016."[69]

54.    Secretary Kelly additionally found that the persistent cholera epidemic strained Haiti's fragile public health system.  He noted that as of 2016, "40% of the population lacks access to fundamental health and nutrition services," and "[e]xtreme poverty, corruption, and low levels of education in Haiti challenge its resilience and have contributed to the government's longstanding inability to adequately provide for the security, health, and safety of its citizenry."[70]

55.    Secretary Kelly found that conditions in Haiti continued to support its designation for TPS.  Yet, even while recognizing that conditions in Haiti warranted the extension of TPS, in the May 2017 announcement, he also presaged DHS's decision to terminate TPS by stating that Haiti's TPS beneficiaries should prepare for their return to Haiti.[71]

*Experts and Officials from Across the Political Spectrum Warn Against TPS Rescission*

56.    Secretary Kelly's signal that DHS would soon terminate Haiti's TPS provoked an overwhelming response from Haitian and American officials across the political spectrum.

57.    On August 24, 2017, Senator Nelson sent a letter strongly urging DHS to grant an 18-month extension of Haiti's TPS designation.[72] Senator Nelson wrote that Hurricane Matthew had significantly delayed Haiti's recovery efforts and pointed out that Secretary Kelly himself had recently observed that Hurricane Matthew caused substantial losses impacting the entire country.

58.    On September 18, 2017, a bipartisan group of United States Congresspersons, including U.S. Rep. Hastings, U.S. Senators Nelson and Rubio, as well as U.S. Reps. Ileana Ros-

---

[69] *Id.*
[70] *Id.*
[71] *Id.*
[72] Letter from Sen. Bill Nelson to Elaine C. Duke, Acting Sec'y of DHS (Aug. 24, 2017), https://www.billnelson.senate.gov/sites/default/files/20170824%20Letter %20to%20Acting%20Secretary%20Duke%20regarding%20Haitian%20TPS.pdf.

Lehtinen, Mario Diaz-Balart, Ted Deutch, Debbie Wasserman Schultz, Carlos Curbelo, Frederica

Wilson, and Lois Frankel, wrote a letter to Defendant Duke.[73] The letter implored Defendant Duke

to grant an 18-month extension of Haiti's TPS.  The letter stated that: "[t]he ongoing extraordinary

conditions that Haiti confronts today are a direct result of the 7.0 magnitude earthquake that hit

Haiti on January 12, 2010 and the major hurricane that hit Haiti on October 4, 2016."[74]

      59.    In October 2017, The Global Justice Clinic at New York University School of Law,

which works on human rights in Haiti, issued a report detailing the extraordinary conditions in

Haiti that prevented nationals from safely returning, including a housing crisis that has left families

stranded in camps and dangerous makeshift shelters; the cholera outbreak, which has caused nearly

10,000 deaths and more than 815,000 cases of illness; and a period of extreme hunger and

malnutrition caused by drought and storms which was exacerbated by the economic shocks of the

earthquake and Hurricane Matthew.[75]  The report found that the Haitian government is still

working to provide effective solutions to the massive displacement caused by the 2010 earthquake

and Hurricane Matthew.[76]  It also found that the cholera epidemic made it unsafe for Haitians

living in the United States to return to Haiti, as did food insecurity, the continuing housing crisis,

and degraded living conditions occasioned by the earthquake and exacerbated by Hurricane

Matthew.[77]

      60.    On October 4, 2017, Haiti's government wrote to DHS to formally request an 18-

month extension in order to "ensure that Haiti is able to adequately move forward with its recovery

---

[73] Letter from Cong. Alcee L. Hastings, et al., to Elaine C. Duke, Acting Sec'y of DHS (Sept. 18, 2017), https://alceehastings.house.gov/news/documentsingle.aspx?DocumentID=398877.
[74] *Id.*
[75] Ellie Happel & Nathan Yaffe, et al., *Extraordinary Conditions: A Statutory Analysis of Haiti's Qualification for TPS* at 1., Global Just. Clinic at the NYU Sch. of Law (Oct. 2017), http://www.ijdh.org/wp-content/uploads/2017/10/
Extraordinary-Conditions_A-Statutory-Analysis-of-Haitis-Qualification-for-TPS.pdf.
[76] *Id.*
[77] *Id.* at 2-3.

and redevelopment plan."[78]   The Haitian government explained that Haiti has undergone a catastrophic and unprecedented series of natural disasters during the preceding seven years, including a cholera epidemic that killed thousands of people, sickened over 800,000 people, and continued to pose a healthcare risk to Haiti.  Resources that the Haitian government had initially earmarked for addressing critical earthquake recovery issues had to be re-appropriated to address the cholera epidemic.  The Haitian government also explained that, in October 2016, Hurricane Matthew, a Category 4 storm with 145 mph winds, the worst to strike the nation in more than five decades, raged through Haiti, destroying over 200,000 homes, wiping out towns and villages, and destroying valuable crops.  This caused a severe food crisis of unparalleled magnitude in Haiti's history.  The economic loss from Hurricane Matthew alone was estimated at 2.8 billion dollars.  The Haitian government further explained that Hurricanes Irma and Maria also caused serious damage to Haiti in 2017, hampering the country's efforts to recover from the earthquake, the cholera epidemic, and Hurricane Matthew.  Hurricanes Irma and Maria destroyed a substantial amount of agricultural crops and flooded communities, which resulted in further displacement.  Furthermore, the impact of the 2017 hurricane season on neighboring island countries caused additional, significant harm to the Haitian economy.  The Haitian government warned that terminating TPS would force the Haitian government to halt its ongoing, short-term redevelopment efforts and focus its limited resources on receiving an influx of citizens, and concluded that, under its current circumstances, "an extension or re-designation of TPS for Haitians is fully warranted and would serve the mutual interests of both countries."

---

[78] Letter from Paul G. Altidor, Haitian Ambassador to the United States, to Elaine C. Duke, Acting Sec'y of DHS (Oct. 4, 2017), http://www.miamiherald.com/latest-news/article178072401.ece/binary/Lettertothe%20HonorableElaineC.Duke.pdf.

61.    On October 19, 2017, the entire Massachusetts Congressional Delegation wrote a letter advising DHS that an 18-month extension is "needed and justified based on the devastation that Haiti has suffered from a series of natural disasters."[79]  The letter explained that extraordinary conditions have incessantly affected Haiti over the last seven years and that the country cannot safely repatriate the more than 50,000 TPS program participants.  The letter reiterated many of the points that the Massachusetts Congressional Delegation outlined in an earlier letter to Secretary Kelly on May 4, 2017, counseling him that extending TPS status for Haitian nationals was absolutely necessary.[80]  Both letters were signed by U.S. Senators Elizabeth Warren and Edward J. Markey, as well as U.S. Reps. Michael E. Capuano, Richard E. Neal, Jim P. McGovern, Stephen F. Lynch, Niki Tsongas, Bill R. Keating, Joseph P. Kennedy III, Katherine Clark, and Seth Moulton.

62.    On October 26, 2017, the Chamber of Commerce of the United States of America urged DHS to extend TPS designation for, *inter alia*, Haiti, noting that the labor force participation for its TPS population is over 80 percent.[81]  The Chamber of Commerce also expressed concern that terminating Haiti's TPS designation would adversely impact some of its member companies and key industries.

63.    On October 27, 2017, Representative Love sent another letter to Defendant Duke, explaining that "TPS is central to our country's commitment in providing safe haven to individuals unable to securely return to their home country due to ongoing violence, environmental disasters,

---

[79] Letter from the Mass. Cong. Delegation to Elaine C. Duke, Acting Sec'y of DHS & Rex Tillerson, Sec'y of State (Oct. 19, 2017),  http://www.ijdh.org/wp-content/uploads/2016/10/Mass-Delegation-Letter-to-DHS-Sec-Kelly-on-Haiti-TPS.pdf.

[80] Letter from the Mass. Cong. Delegation to John F. Kelly, Acting Sec'y of DHS & Rex Tillerson, Sec'y of State (May 4, 2017), http://www.ijdh.org/wp-content/uploads/2016/10/Mass-Delegation-Letter-to-DHS-Sec-Kelly-on-Haiti-TPS.pdf.

[81] Letter from Neil L. Bradley, Senior V.P., U.S. Chamber of Commerce, to Elaine C. Duke, Acting Sec'y of DHS (Oct. 26, 2017), https://www.uschamber.com/sites/default/files/171024_temporaryprotectedstatus_dhs_duke.pdf.

or other extraordinary conditions.  Haiti continues to face such conditions."[82]    Representative

Love's October 2017 letter reaffirmed the points that she made in her March 2017 letter.[83]

64.    On October 31, 2017, U.S. Senate Minority Leader Charles E. Schumer and U.S.

Senators Kirsten Gillibrand, Robert Menendez, and Cory Booker sent a letter to Secretary of State

Tillerson and Defendant Duke, warning that terminating Haiti's TPS designation would jeopardize

regional stability and security and impair Haiti's fragile recovery efforts.[84] The letter also

cautioned that terminating Haiti's TPS designation would endanger the health and safety of TPS

holders.  The letter reaffirmed the points that Senators Schumer and Gillibrand made in March

2017.[85]

65.    On November 1, 2017, 78 members of the U.S. House of Representatives joined

Congressman Jimmy Gomez's letter to Defendant Duke and Mr. Kelly, calling on the United

States to fulfill its role as a humanitarian leader by renewing Haiti's and other countries' TPS.[86]

The letter noted the economic contributions of all TPS recipients and the economic harm that could

result from rescission, including an estimated loss of more than $45.2 billion dollars in GDP over

the next decade. With respect to Haiti, the letter explained that the earthquake had severely

---

[82] Letter from Cong. Mia B. Love, et al. to Elaine C. Duke, Acting Sec'y of DHS (Oct. 27, 2017),
http://www.ijdh.org/wp-content/uploads/2017/10/TPS-Extension-for-Haitian-Nationals-10-27-17.pdf.
[83] *See* Letter from Love to Obama, *supra* note 47.
[84] Letter from Sen. Minority Leader Charles E. Schumer & Sens. Kirsten Gillibrand, Robert Menendez & Cory
Booker, to Rex Tillerson, Sec'y of State, & Elaine C. Duke, Acting Sec'y of DHS (Oct. 31, 2017),
https://www.gillibrand.senate.gov/imo/media/doc/TPS%20Haiti%20Letter%202017.pdf.
[85] Letter from Sen. Minority Leader Charles E. Schumer & Sen. Kirsten Gillibrand, to Rex Tillerson, Sec'y of State,
& Elaine C. Duke, Acting Sec'y of DHS (Mar. 24, 2017),
https://www.gillibrand.senate.gov/imo/media/doc/Letter%20to%20DHS%20and%
20State%20re%20Haitian%20TPS%203.24.17.pdf.
[86] Letter from Cong. Jimmy Gomez & 78 other House Colleagues to John Kelly, White House Chief of Staff, &
Elaine C. Duke, Acting Sec'y of DHS (Nov. 1, 2017), https://gomez.house.gov/uploadedfiles/11-01-
2017_congressman_jimmy_gomez_letter_to_white_
house_cos_kelly_and_dhs_acting_secretary_duke_re_temporary_protected_status.pdf.

damaged the island's infrastructure, such that the conditions that prompted the most recent TPS extension persist and warrant continued protection.

66.     On November 3, 2017, the Congressional Black Caucus wrote a letter to Defendant Duke that described the May 24, 2017, decision not to re-designate Haiti for the full 18 months as contrary to "the facts on the ground."[87] The letter advised DHS that terminating Haiti's TPS designation would end essential remittances to Haiti from the United States, while simultaneously forcing Haiti to absorb the cost of reintegrating thousands of people, and concluded that it is in the best interests of Haiti and the United States to redesignate Haiti for another 18 months of TPS.

67.     On November 8, 2017, the Senate Foreign Relations Committee Ranking Member Senator Ben Cardin explained that following the catastrophic 2010 hurricane, Haiti's capacity to manage repatriation efforts have faced substantial setbacks, compounded by two Category 5 hurricanes that occurred just two months earlier.[88]  The letter emphasized that an April 2017 DHS memorandum had itself reported that an estimated 30 percent of the Haitian population suffers from food insecurity, and 40 percent of the population lacks access to fundamental health and nutrition services. Senator Cardin's letter emphasized the recommendation that he made in May 2017, that an extension of the TPS designation was fully warranted.[89]

68.     On November 9, 2017, 58 members of the U.S. Senate and House wrote a letter encouraging DHS to extend TPS designation to participants in the program from Haiti and other

---

[87] Letter from the Congressional Black Caucus to Elaine C. Duke, Acting Sec'y of DHS (Nov. 3, 2017), http://www.ijdh.org/wp-content/uploads/2017/10/CBC-Haiti-TPS-Update-Letter.pdf.
[88] Letter from Sen. Benjamin L. Cardin, Ranking Member Comm. on Foreign Relations, to Elaine C. Duke, Acting Sec'y of DHS (Nov. 8, 2017), https://www.foreign.senate.gov/.
imo/media/doc/11-8-17%20BLC%20letter%20to%20DHS%20on%20Haiti%20TPS%20extension.pdf.
[89] Letter from Sen. Benjamin L. Cardin, Ranking Member Comm. on Foreign Relations, to John F. Kelly, Acting Sec'y of DHS & Rex Tillerson, Sec'y of State (May 18, 2017), http://www.ijdh.org/wp-content/uploads/2016/10/5-18-17-BLC-letter-to-Tillerson-and-Kelly-on-Haiti-TPS.pdf.

nations.[90]   The letter emphasized that nearly 275,000 Americans have parents who are TPS recipients from El Salvador, Honduras, or Haiti and who will be forced to choose between leaving their children or risking deportation if they lose TPS designation.

69.     On November 14, 2017, Governor Charlie Baker of Massachusetts implored Defendant Duke to recognize the unsuitability of ordering tens of thousands of Haitians to return to a place that is in crisis and that will be at risk of becoming further destabilized by a sudden influx of TPS nationals.[91]   Governor Baker recommended that TPS should be extended for, *inter alia*, the 5,000 Haitians in Massachusetts because it would be inconsistent "with the traditions and values of the United States to order the return of large numbers of foreign nationals who have been following our laws and contributing to our economy and culture to countries that are dangerous, politically unstable, and incapable of providing basic services and protections for their citizens."[92]

70.     On November 15, 2017, the National Haitian-American Elected Officials Network ("NHAEON") — an organization comprised of 41 federal, state, and local elected officials of Haitian descent  – explained that, even before the 2010 earthquake, Haiti ranked 145th out of the 169 countries in the U.N. Human Development Index, the lowest in the Western Hemisphere.[93] NHAEON also explained that, before the 2010 earthquake, more than 70 percent of people in Haiti were living on fewer than $2 per day; 86 percent of people in Port-au-Prince were living in slum conditions; and half of the population in Port-au-Prince had no access to latrines and only one-third had access to tap water.  In light of these already difficult conditions, the 2010 earthquake

---

[90] Letter from 58 members of the Senate & House, to Elaine C. Duke, Acting Sec'y of DHS (Nov. 9, 2017) https://votesmart.org/public-statement/1205364/letter-to-the-hon-elaine-c-duke-acting-secretary-of-homeland-security-reverse-administration-decision-to-expose-thousands-to-dangerous-deportations#.Wl5A1ainGUk.
[91] Letter from Charlie Baker, Gov. of Massachusetts, to Elaine C. Duke, Acting Sec'y of DHS (Nov. 14, 2017), https://www.scribd.com/document/364519924/Gov-Baker-TPS-Letter-to-Secretary-Duke#download&from_embed.
[92] *Id.*
[93] Letter from NHAEON to Pres. Donald J. Trump, & Elaine C. Duke, Acting Sec'y of DHS (Nov. 15, 2017), http://www.ijdh.org/wp-content/uploads/2017/10/National-Haitian-American-Elected-Officials-Network.pdf.

was particularly devastating: 105,000 houses were destroyed and an additional 188,000 houses were badly damaged; 1.5 million people became homeless; 19 million cubic meters of rubble and debris clogged Port-au-Prince, "enough to fill a line of shipping containers stretching end to end from London to Beirut";[94] 4,000 schools were damaged or destroyed; 25 percent of civil servants in Port-au-Prince died; and 60 percent of government and administrative buildings were destroyed or damaged.

71.    On November 17, 2017, Senator Nelson, along with Senator Rubio, and U.S. Reps. Hastings, Ileana Ros-Lehtinen, Frederica Wilson, Mario Diaz-Balart, Lois Frankel, Debbie Wasserman Schultz, Ted Deutch, and Carlos Curbelo, urged Defendant Duke to extend Haitian TPS for 18 months.[95]  They stated that the need for a full extension is clear, and that "Haiti—the poorest country in the Western Hemisphere—continues to recover from the devastating 2010 earthquake which killed more than 200,000 people and displaced more than a million."  They further explained that, "[t]o this day, Haiti struggles to combat an outbreak of cholera introduced by United Nations relief workers following the earthquake that has already killed more than 10,000 people."  They also cited the extensive damage Hurricane Matthew caused in 2016, destroying much of Haiti's food crops and leaving millions of Haitians food insecure.  In their bipartisan letter, these members of Congress stated that these "persistent, difficult conditions in Haiti warrant a full extension  . . . [and we] owe it to the Haitian people to assist them in their efforts, especially as they begin to make limited progress.  Haiti simply cannot absorb the premature return of 60,000 people at once."

---

[94] *Id.*
[95] Letter from Sens. Bill Nelson, Marco Rubio, & other Florida lawmakers to Elaine C. Duke, Acting Sec'y of DHS (Nov. 17, 2017), https://www.billnelson. senate.gov/newsroom/news/sen-bill-nelson-calls-on-dhs-to-extent-tps-for-haitian.

72.     In November 2017, the United States Conference of Catholic Bishops issued a report on conditions in Haiti.[96]  Their delegation met with Haitian government officials, the U.S. Embassy, the U.N. High Commissioner for Refugees, the U.N. Development Program, and the International Organization for Migration.  The delegation analyzed Haiti's progress since its initial designation for TPS in 2010 and assessed its ability to safely accept and reintegrate returned nationals.  The delegation concluded that "the country is not yet at a point where it can safely accommodate the return of 50,000 TPS recipients" because Haiti is still "in the midst of recovery, as evidenced by the thousands that remain displaced in camps and the key infrastructure that has yet to be rebuilt."[97]  The delegation also found "no evidence of capacity to provide large-scale reintegration services for repatriated nationals with TPS."[98]

73.     Haiti's Ambassador to the United States and its Foreign Minister also met with Defendant Duke in November 2017 to lay out their case for renewal and petition for a TPS extension because, according to Haiti's Ambassador, "some of the key conditions that warranted TPS in the first place are still existing."[99]

*Circumstantial and Direct Evidence that DHS's Rescission of TPS for Haiti was Motivated by Discrimination*

74.     Despite the overwhelming evidence that TPS for Haiti remains necessary given ongoing conditions in the country, on November 20, 2017, Defendant Duke publicly announced her decision to terminate TPS for Haiti with a delayed effective date of 18 months.

---

[96] U.S. Conf. of Catholic Bishops, *Haiti's Ongoing Road to Recovery: The Necessity of an Extension of Temporary Protected Status* (Nov. 2017), http://www.usccb.org/about/migration-policy/fact-finding-mission-reports/upload/mrs-haiti-trip-report.pdf.
[97] *Id.* at 2.
[98] *Id.* at 2-3.
[99] Ted Hesson, *Haitian officials press Duke,* Politico (Nov. 17, 2017), https://www.politico.com/newsletters/morning-shift/2017/11/17/haitian-officials-press-duke-026792.

75.    According to the DHS Office of the Press Secretary's November 20, 2017, press release ("press release"), the decision to terminate Haitian TPS was made after a review of the conditions upon which the original designation was based.  The press release stated that "[b]ased on all available information, including recommendations received as part of an inter-agency consultation process, Acting Secretary Duke determined that those extraordinary but temporary conditions caused by the 2010 earthquake no longer exist."[100]   The press release did not acknowledge, much less attempt to address, the overwhelming evidence cited above demonstrating that conditions in Haiti, in fact, have not sufficiently recovered from the 2010 earthquake.  There was no discussion about what constituted the "inter-agency consultation" referred to in the press release.

76.    Although DHS published its other TPS determinations in the Federal Register within days of publicly announcing the decisions, it took DHS until January 18, 2018, to provide an analysis to support its putative reasons for the rescission decision.  This unprecedented delay disrupted the lives of TPS recipients across the country.  That is because the last extension—issued on May 24, 2017, and set to expire on January 22, 2018—remained operative until DHS gave notice in the Federal Register of its November 2017 decision to rescind.  Until DHS published its November 2017 decision in the Federal Register, Haitian immigrants with TPS would be unable to legally work or receive public benefits after January 22, 2018.  As a result, upon information and belief, scores of Haitians with TPS lost or were denied employment and/or federal entitlements like Medicare because they were unable to timely re-apply for those benefits.

---

[100] Press Release, Acting Sec'y Elaine Duke Announcement on Temporary Protected Status for Haiti, DHS website (Nov. 20, 2017), https://www.dhs.gov/news/2017/11/20/acting-secretary-elaine-duke-announcement-temporary-protected-status-haiti#.

77.      According to the notice published on January 18, 2018, the "Acting Secretary of [DHS] determined on November 2017 that conditions in Haiti no longer support its designation for TPS" after consultation with the "appropriate U.S. Government agencies."[101]  It is noteworthy that Defendant Duke only refers generally to "U.S. Government agencies," while all previous Haitian TPS notices in the Federal Register referred to DHS's consultations with the Department of State.   The January 18, 2018, notice does not indicate whether DHS consulted with the Department of State before the rescission.

78.      Defendant Duke also stated in the Federal Register that Haiti has made "progress recovering from the 2010 earthquake and subsequent effects that formed the basis for its designation."  Defendant Duke relied upon the decrease in internally displaced persons and on the closure of 98 percent of the internally displaced persons camps. Defendant Duke also noted that, in October 2017, the United Nations withdrew its peacekeeping mission.

79.      Defendant Duke further stated that Haiti "successfully completed its presidential election in February 2017" and that key government infrastructure was being rebuilt.  Defendant Duke added that the annual GDP growth "has been generally positive since 2010, averaging 1.7 percent over the period (2010-2016)," and that "cholera is currently at its lowest level since the outbreak began."

80.      Defendant Duke's stated reasoning for rescinding Haiti's TPS represents a sharp departure from DHS's ordinary decision-making process.   Under 8 U.S.C. § 1254a, DHS is required to consider "the conditions in the foreign state . . . for which a designation is in effect under this subsection and . . . determine whether the conditions for such designation under this subsection continue to be met."   Consistent with that statutory mandate, DHS has previously

---

[101] Termination of the Designation of Haiti for Temporary Protected Status, 83 Fed. Reg. 2,648, 2,648 (Jan. 18, 2018).

undertaken a careful review as to whether conditions in Haiti continued to reflect the severe problems with respect to housing, food security, infrastructure, public health, access to health care, and gender-based violence that originally resulted from the 2010 earthquake and warranted Haiti's TPS designation. Defendant Duke, however, failed to fully consider those factors in rescinding Haiti's TPS.

81.    For example, Defendant Duke failed to address the persistent gender-based violence in the internally displaced persons camps, which Mr. Kelly himself described as a serious concern just months earlier. Defendant Duke also failed to consider the fact that people who were displaced by the earthquake moved back to unsafe homes or were relocated to informal settlements in hazardous areas. Defendant Duke also failed to consider the extent of the damage that Hurricane Matthew caused, which Mr. Kelly noted killed more than 500 people and left more than 150,000 without housing. Defendant Duke also failed to address that 40 percent of the Haitian population lacked access to fundamental health and nutrition services. Defendant Duke also failed to address the questionable habitability of the buildings the earthquake destroyed, or conditions in the remaining internally displaced persons camps. Furthermore, although Defendant Duke noted the decrease in cholera, she failed to consider whether access to medical care had improved or whether Haiti's physical health infrastructure was restored.

82.    Remarkably, Defendant Duke cited the completion of Haiti's presidential election in February 2017 to support the rescission decision, even though that election was already complete when Mr. Kelly extended Haitian TPS in May 2017.[102]

83.    Defendant Duke also relied on modest total GDP growth (under two percent a year) to determine that the conditions in Haiti were sufficiently improved to rescind TPS. But in 2011,

---

[102] Haiti's presidential election was complete in November 2016, when the current president secured enough votes to avoid a runoff vote. In February 2017, the president was sworn in.

the Secretary found that 80 percent of Haiti's population was living below the poverty line and that per capita GDP was under $2 per day.  The 2018 determination fails to address whether these economic metrics have improved.

84.     In addition, Defendant Duke failed to indicate whether DHS considered the Haitian government's input and the reservations that it expressed about rescinding TPS.  DHS also failed to consider how the Caribbean hurricanes that have occurred since 2010 may have impacted Haiti's recovery.

85.     Defendant Duke also failed to address the issue of food insecurity.  She failed to do so although Secretary Napolitano noted that food insecurity continued to be a problem two years after the earthquake; although Secretary Johnson noted the earthquake's continuing impact on food insecurity years after the earthquake, and although, just five months earlier, then-Secretary Kelly noted that Hurricane Matthew caused extensive crop damage.

86.     In all of the foregoing respects, DHS departed from the normal decision-making process in deciding to rescind Haitian TPS by failing to engage the factors identified in the original determination, the factors identified in the four subsequent 18-month extensions, and the factors that Mr. Kelly identified in his extension just five months earlier.

87.     Further, the reasons offered by DHS in the press release and Federal Register announcement appear to be pretextual.  Months earlier, DHS had attempted to manufacture evidence of a different nature to support rescission.  In early 2017, while Mr. Kelly was Secretary of Homeland Security, DHS officials sought crime data on Haitians with TPS.  DHS also sought information on how many Haitian nationals were receiving public benefits in the United States. After USCIS staff said they could not gather information about wrongdoing, policy chief Kathy Nuebel Kovarik pressed.  "I know some of it is not captured," she said, "but we'll have to figure

out a way to squeeze more data out of our system."[103]  The Administration's efforts to gather this

data on Haitian TPS recipients trades on false anti-Black stereotypes about criminality and

exploitation of public benefits, and suggests the effort to manufacture a public safety rationale for

the planned rescission.

88.     On May 17, 2017, Senator Nelson wrote to Secretary Kelly to express his concern

about "reports that there is an effort to find selective examples of criminal activity by Haitian

Nationals as part of the Department's review of TPS."[104]  On May 19, 2017, Senators Menendez,

Ron Wyden, Markey, Gillibrand, and Sherrod Brown wrote to Secretary Kelly "regarding the

troubling news that your department has asked for information on the criminal history and public

benefits use of Haitians protected under [TPS]."[105]  "Considering that you must make a decision

on whether to extend TPS for eligible Haitians by May 22," they wrote, "we are concerned that

you will use this information in your decision.  Such analysis would be outside the statutory

framework for deciding whether to extend TPS, and it would be a disturbing executive

overreach."[106]  They noted that "the timing of this information request suggests that this

information is pretext to deny an extension of TPS," and urged DHS to "keep [its] review within

the bounds dictated by Congress."[107]

*The Administration's Overt Racial Bias Against Immigrants of Color and Haitians in Particular*

89.     In addition to this evidence showing that DHS departed from its normal decision-

making process and appeared to offer pretextual reasons for rescinding Haiti's TPS, the evidence

---

[103] Alicia A. Caldwell, *AP Exclusive: US digs for evidence of Haiti immigrant crimes*, AP News (May 9, 2017),
https://apnews.com/740ed5b40ce84bb398c82c48884be616.
[104] Letter from Sen. Bill Nelson to John F. Kelly, Sec'y of DHS (May 17, 2017), http://www.ijdh.org/wp-
content/uploads/2016/10/2017-05-17-Nelson-to-Kelly-Haiti-TPS-Extension.pdf.
[105] Letter from Sens. Robert Menendez, et al., to John F. Kelly, Sec'y of DHS (May 19, 2017),
https://www.menendez.senate.gov/imo/media/doc/HAITI-TPS_5_19_17.pdf.
[106] *Id.*
[107] *Id.*

of the Administration's overt bias against immigrants of color, and Haitians in particular, strongly supports an inference that DHS's decision was motivated by racial discrimination.

90.    Since announcing his candidacy for public office, President Trump has repeatedly made statements revealing discriminatory intent against immigrants of color from around the world, including Black and Latino immigrants.[108]  In June 2015, he started his presidential bid by disparaging South and Central American immigrants: "When Mexico sends its people, they're not sending their best. . . . They're sending people that have lots of problems, and they're bringing those problems with us.  They're bringing drugs.  They're bringing crime.  They're rapists . . . . It's coming from more than Mexico.  It's coming from all over South and Latin America."[109]

91.    Then-candidate Trump repeated that sentiment in August 2015, when he stated that, "The Mexican government . . . send[s] the bad ones over because they don't want to pay for them. They don't want to take care of them."[110]

92.    In November 2015, then-candidate Trump disseminated a debunked story about "thousands and thousands of people" celebrating the September 11, 2001, attacks, in New Jersey, where, in his words, "you have large Arab populations."[111]

---

[108] The President has repeatedly expressed the view that immigrants of color bring disease and crime into the United States.  *See, e.g.*, Donald J. Trump (@realDonaldTrump), Twitter (Feb. 24, 2015, 4:47 PM), https://twitter.com/realdonaldtrump/status/570384640281870337?lang=en ("The Mexican legal system is corrupt, as is much of Mexico. Pay me the money that is owed me now - and stop sending criminals over our border."); Donald J. Trump (@realDonaldTrump), Twitter (Aug. 5, 2014, 5:55 AM), https://twitter.com/realdonaldtrump/status/496640747379388416?lang=en ("Our government now imports illegal immigrants and deadly diseases.").

[109] *Full text: Donald Trump announces a presidential bid*, Wash. Post (June 16, 2015), https://www.washingtonpost.com/news/post-politics/wp/2015/06/16/full-text-donald-trump-announces-a-presidential-bid/?utm_term=.9dd8ac586d54.

[110] Andrew O'Reilly, *At GOP debate, Trump says 'stupid' U.S. leaders are being duped by Mexico*, Fox News (Aug. 6, 2015), http://www.foxnews.com/politics/2015/08/06/at-republican-debate-trump-says-mexico-is-sending-criminals-because-us.html.

[111] Glenn Kessler, *Trump's outrageous claim that 'thousands' of New Jersey Muslims celebrated the 9/11 attacks*, Wash. Post (Nov. 22, 2015), https://www.washingtonpost.com/news/fact-checker/wp/2015/11/22/donald-trumps-outrageous-claim-that-thousands-of-new-jersey-muslims-celebrated-the-911-attacks/?utm_term=.88120e0b9d60 (video embedded).

93.     President Trump's anti-immigrant bias extends to native-born American citizens of Hispanic descent, whom he perceives to be alien.  In June 2016, then-candidate Trump questioned United States District Judge Gonzalo Curiel's competence to preside over a lawsuit because his Mexican heritage made him "pro-Mexican."[112]     Speaker of the United States House of Representatives Paul Ryan characterized Mr. Trump's statement as "sort of like the textbook definition of a racist comment."[113]

94.     In October 2016, then-candidate Trump responded to a presidential debate question about immigration by stating: "We have some bad hombres here, and we're going to get them out."[114]

95.     In December 2016, referring to an article about a crime wave on Long Island, President-Elect Trump said, "They come from Central America. They're tougher than any people you've ever met.  They're killing and raping everybody out there.  They're illegal.  And they are finished."[115]

96.     President Trump articulated his antipathy towards Haitians in particular in June 2017, when, during a meeting in the Oval Office with then-Homeland Security Secretary Kelly and Secretary of State Tillerson, he reportedly reacted to a document listing how many immigrants had received visas to enter the United States in 2017.  Upon learning that 15,000 Haitian people

---

[112] Transcript of Face the Nation, CBS News (June 5, 2016 12:57 PM), https://www.cbsnews.com/news/face-the-nation-transcripts-june-5-2016-trump/; Jose A. DelReal & Katie Zezima, *Trump's personal, racially tinged attacks on federal judge alarm legal experts*, Wash. Post (June 1, 2016), https://www.washingtonpost.com/politics/2016/06/01/437ccae6-280b-11e6-a3c4-0724e8e24f3f_story.html?utm_term=.5c1816dc5543.
[113] Allan Smith, *PAUL RYAN: Trump's attacks on judge "the textbook definition of a racist comment,"* Business Insider (June 7, 2016), http://www.businessinsider.com/paul-ryan-trump-racist-curiel-judge-2016-6.
[114] Katie Zezima, *Trump on immigration: There are 'bad hombres' in the United States*, Wash. Post (Aug. 30, 2017).
[115] Michael Scherer, *2016 Person of the Year: Donald Trump*, TIME (Dec. 2016), http://time.com/time-person-of-the-year-2016-donald-trump/.

had received such visas, President Trump is reported to have stated they "all have AIDS."[116] During that June 2017 meeting, President Trump also learned that 40,000 immigrants from Nigeria had received visas to enter the United States in 2017.  According to news reports, he reacted by stating that, once they had seen the United States, these Nigerian immigrants would never go back to their "huts" in Africa.[117]  The President and Mr. Kelly upbraided Secretary Tillerson for the perceived influx of immigrants of color.

97.     A White House press statement obliquely denied what they characterized as "these outrageous claims" and criticized the reporting for relying on anonymous sources,[118] although the report was the product of more than 36 interviews.  The White House also denied using the words "AIDS" or "huts" to describe people from any country.

98.     On January 11, 2018, during a White House meeting with several U.S. Senators, the President is alleged to have disparaged a draft immigration plan that protected people from Haiti, El Salvador, and some African countries, asking, "Why are we having all these people from shithole countries come here?"[119]  President Trump is alleged to have further disparaged Haitians in particular, asking "Why do we need more Haitians?" and ordered the bill's drafters to "take them out."[120]  In this meeting, the President is further alleged to have expressed his preference for

---

[116] Michael D. Shear & Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, N.Y. Times (Dec. 23, 2017), https://www.nytimes.com/2017/12/23/us/politics/trump-immigration.html. This article states that other officials insist that President Trump never used the words "AIDS" or "huts."  Several participants in the meeting said that they did not recall President Trump using those words.
[117] *Id.*
[118] Eli Watkins, *WH denies NYT report claiming Trump said Haitian immigrants "all have AIDS,"* CNN (Dec. 24, 2017), https://www.cnn.com/2017/12/23/politics/donald-trump-oval-office-immigration/index.html.
[119] Josh Dawsey, *Trump derides protections for immigrants from 'shithole' countries*, Wash. Post (Jan. 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html?utm_term=.b56f11cc896f. Other senators have suggested the word used might have been "shithouse."  Julie Hirschfeld Davis, *Trump's Harsh Words, Not His Plan for Wall, Dominate Hearing*, N.Y. Times (Jan. 16, 2018), https://www.nytimes.com/2018/01/16/us/politics/trump-shithole-shithouse-immigration.html.
[120] *Id.*

more immigrants from places like Norway,[121] where the population is over 90 percent white. Haiti's population, by contrast, is over 95 percent Black.

99.    President Trump has also obliquely denied these reports, tweeting, "The language used by me at the DACA meeting was tough, but this was not the language used."[122]  President Trump has also denied saying "anything derogatory about Haitians other than Haiti is, obviously, a very poor and troubled country."[123]

100.    According to Senator Dick Durbin, a participant in the White House meeting, "After [Senator] Lindsey [Graham] and I left the room and got in the car together to come back to Capitol Hill, it was silence in the car.  We had just witnessed something that neither one of us ever expected."[124]  Senator Durbin has stated that he warned the President that singling out Haitians for exclusion was "an obvious racial decision."[125]

101.    By the time Defendant Duke rescinded Haiti's TPS status in November 2017, President Trump had already made his discriminatory intent against Haitian immigrants clear, as the meeting described above between President Trump, Mr. Kelly, and Secretary Tillerson occurred in June 2017.  And, on or about April 2017, Mr. Kelly had directed DHS to seek evidence that Haitians were engaged in criminal conduct or receiving public welfare benefits.

102.    Further, there is direct evidence that the Administration has pressured DHS with respect to another TPS decision involving a country whose population is predominantly non-white. On November 6, 2017, Mr. Kelly, in his capacity as White House Chief of Staff, and White House

---

[121] *Id.*
[122] Donald J. Trump (@realDonaldTrump), Twitter (Jan. 12, 2008), https://twitter.com/realDonaldTrump/status/951793123985973248.
[123] Doina Chiacu & James Oliphant, *Trump denies vulgar remarks about Haiti, African countries; condemnation mounts,* Reuters (Jan. 12, 2018), https://www.reuters.com/article/us-usa-immigration/trump-denies-vulgar-remarks-about-haiti-african-countries-condemnation-mounts-idUSKBN1F11H8.
[124] Carl Hulse, *Inside the Oval Office Immigration Meeting That Left a Senator Stunned*, N.Y. Times (Jan. 19, 2018), https://www.nytimes.com/2018/01/19/us/politics/trump-durbin-immigration-daca.html.
[125] *Id.*

Homeland Security Adviser Tom Bossert repeatedly telephoned Defendant Duke to pressure her to rescind Honduras's TPS designation. A former official with knowledge of the call said, "They put massive pressure on her." Mr. Kelly made the call from Japan, where he was travelling with President Trump. Mr. Kelly was described as irritated and persistent, and told Duke that the extension "prevents our wider strategic goal" on immigration.[126]

*History of Anti-Haitian Discrimination by the United States*

103.    The relationship of the United States to Haiti has been, for centuries, punctuated by the prejudices and stereotypes that inform the Administration's decision to rescind TPS for Haiti.

104.    The United States was deeply unsettled when self-liberated slaves formed the Republic of Haiti in 1804, for fear that the Haitian example would stir domestic racial violence. As the scholar Michael Dash writes, "[f]rom the beginning, relations between Haiti and the United States were coloured by a tendency by the latter to project its fantasies and insecurities onto the recently independent black state."[127] Thomas Jefferson predicted that Haiti would spread ideas of rebellion to the United States which would eventually lead to racial "convulsions which would probably never end but in the extermination of one or the other race."[128] Senator Thomas Benton of Missouri warned not to "permit black consuls and ambassadors to establish themselves in our cities, and parade through the country, and give their fellow blacks in the United States proof in hand of the honors which await them for a successful revolt on their part."[129] The United States refused to recognize Haiti's independence until 1862.

---

[126] Nick Miroff, *White House chief of staff tried to pressure acting DHS secretary to expel thousands of Hondurans, officials say*, Wash. Post (Nov. 9, 2017), https://www.washingtonpost.com/world/national-security/white-house-chief-of-staff-tried-to-pressure-acting-dhs-secretary-to-expel-thousands-of-hondurans-officials-say/2017/11/09/914d3700-c54a-11e7-a441-3a768c8586f1_story.html?utm_term=.076d78250e7e.

[127] J. Michael Dash, *Haiti and the United States: National Stereotypes and the Literary Imagination* 2 (Palgrave Macmillan, 2d ed. 2014).

[128] *Id.* at 7.

[129] *Id.* at 8.

105.    Instances of systematic federal government discrimination against Haitians continued well into the 20th Century.  In one episode that is redolent of President Trump's association of Haitians with AIDS, in 1983, the U.S. Centers for Disease Control and Prevention ("CDC") singled out Haitians as being at a high risk for contracting HIV/AIDS by virtue of their national identity.  The CDC warned physicians who cared for Haitian patients to "be aware that opportunistic infections may occur in this population."[130]    In 1990, the Food and Drug Administration issued a nation-wide ban on Haitian blood donations.    By the time the CDC stopped singling out Haitians, they were already widely associated with the disease, as they were the only ethnic group singled out based on national origin.

106.    The federal government also has a well-documented history of discrimination against Haitians with respect to federal immigration policy, which is reflected in the sharply disparate treatment the government has accorded Haitian immigrants compared to their Cuban counterparts, although Haiti and Cuba share comparable histories of persecution and economic deprivation.  That disparity is manifest in the so-called Wet-Foot/Dry-Foot immigration policy, which allows Cuban immigrants who reach American soil to remain and become American citizens.  Haitians have no such special status.  While Cuba's status as a communist country may have been a factor, the Cuban refugees were also "largely middle class and white," while Haitians are "100 percent black by American standards."[131]

107.    Not a single Haitian refugee or asylee was accepted by the United States for permanent refugee status between 1981-1990.[132]  In 1989, Bruce Morrison, then chair of the House

---

[130] *Opportunistic Infections and Kaposi's Sarcoma among Haitians in the United States*, Ctr. for Disease Control & Prevention (July 9, 1982), https://www.cdc.gov/mmwr/preview/mmwrhtml/00001123.htm.

[131] Roger Daniels, *Guarding the Golden Door: American Immigration Policy and Immigrants Since 1882* 213 (Hill & Wang 2004).

[132] *Id.*

Subcommittee on Immigration, pointed out how the Immigration and Naturalization Service was treating Haitians unfairly.  "There's been a lot of discrimination [against them]," he said, "They're black, they are from a nation close to ours, and their country isn't communist."[133]  As scholar Roger Daniels explains,

> it is instructive to note that, despite the ideological differences between the Carter, Reagan, Bush I, Clinton, and Bush II administrations, each has persistently discriminated against Haitian entrants as opposed to Cubans.  The Reagan administration began the practice of towing Haitian, but not Cuban, vessels back to where they came from, the first Bush administration initiated the use of the naval base at Guantanamo for detained Haitians, and the Clinton administration expanded the use of the Cuban base, out of the federal judiciary's reach, as a warehouse for Haitians.[134]

### COUNT I
**(Violation of the Fifth Amendment to the United States Constitution)**

108.   Plaintiffs incorporate the allegations in paragraphs 1-107 by reference as if fully set forth herein.

109.   The Due Process Clause of the Fifth Amendment incorporates the equal protection principal of the Fourteenth Amendment.  *Sessions v. Morales-Santana*, 137 S. Ct. 1678 (2017); *United States v. Windsor*, 133 S. Ct. 2675 (2013); *Bolling v. Sharpe*, 347 U.S. 497 (1954).

110.   The Due Process Clause of the Fifth Amendment also prohibits irrational government action.  *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973).

111.   The Administration's decision to rescind TPS protections for Haitians living the United States violates both aspects of the Fifth Amendment because the Administration intended to discriminate against Haitian immigrants to the United States because of race and/or ethnicity.

112.   The inference of race and/or ethnicity discrimination is supported by the Administration's departure from the normal decision-making process; the fact that the decision

---

[133] *Id.*
[134] *Id.* at 214.

bears more heavily on one race than another; the sequence of events leading to the decision; the contemporaneous statements of decisionmakers; and the historical background of the decision. The Supreme Court has recognized these factors as probative of intentional discrimination.  *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977).

113.   The inference of race and/or ethnicity discrimination is supported by the departure of DHS, Defendant Duke, and/or Defendant Nielsen from the analysis that previous Secretaries of Homeland Security have undertaken.  The previous Secretaries' consistent practice set the standard of review for TPS extension and/or termination decisions, and made clear what kind of review is appropriate under INA § 244(b)(3) and 8 U.S.C. § 1254a.

114.   The inference of race and/or ethnicity discrimination is also supported by the departure of DHS, Defendant Duke, and/or Defendant Nileson from INA § 244(b)(3)'s and 8 U.S.C. § 1254a's requirement that DHS undertake a genuine, good faith review of the conditions in a foreign state designated for TPS to determine whether the conditions for designation continue to be met.

115.   The inference of race and/or ethnicity discrimination is also supported by the departure of DHS and/or Defendant Nielsen from DHS's custom of timely publishing Haitian TPS decisions in the Federal Register, to the severe detriment of many Haitian TPS holders.

116.   The inference of race and/or ethnicity discrimination is also supported by Mr. Kelly's efforts to manufacture evidence that Haitian TPS recipients engaged in criminal activity or exploited public benefits.

117.   The inference of race and/or ethnicity discrimination is also supported by the White House's exertion of pressure on Defendant Duke to expel tens of thousands of Hondurans living in the United States in order to achieve the Administration's wider strategic goals on immigration.

118.    The inference of race and/or ethnicity discrimination is also supported by President Trump's contemporary statements disparaging Haitian and other Black immigrants from so-called "shithole countries" and expressed preference for immigrants from Norway.

119.    The inference of race and/or ethnicity discrimination is also supported by the historical background of the decision, including the federal government's history of racial and/or ethnic discrimination against Haitian immigrants. *See, e.g.*, *Comm'r., I.N.S. v. Jean*, 496 U.S. 154 (1990), *aff'g sub nom. Jean v. Nelson*, 863 F.2d 759 (11th Cir. 1988) (finding that Haitian immigrants were prevailing parties in a suit to end federal policies of conducting mass exclusion hearings without counsel and of detentions pending the determination of political asylum applications); *Haitian Refugee Ctr. v. Smith*, 676 F.2d 1023 (5th Cir. 1982) (requiring the adoption of a procedurally fair plan for the orderly reprocessing of asylum claims of Haitian immigrants); *Haitian Ctrs. Council, Inc. v. Sale*, 823 F. Supp. 1028 (E.D.N.Y. 1993) (finding that federal executive officials violated the Refugee Act and the due process rights of prescreened HIV positive Haitian immigrants by detaining them without parole and subjecting them to further screening interviews without benefit of counsel or other procedural safeguards); *Louis v. Meissner,* 530 F. Supp. 924 (S.D. Fla. 1981) (access to counsel, fair hearings, erroneous deportation); *Sannon v. United States,* 427 F. Supp. 1270 (S.D. Fla. 1977) (political asylum claims in exclusion as opposed to deportation hearing), *vacated as moot,* 631 F.2d 1247 (5th Cir. 1980) (holding that the newly promulgated federal regulations offered same relief as that ordered by district judge).

120.    As a direct and proximate result of the rescission of Haitian TPS by Defendants and/or their agents, Plaintiffs and some of their members have been deprived of their rights under the Fifth Amendment to the United States Constitution.

44

## COUNT II
### (Mandamus, 28 U.S.C. § 1361)

121.    Plaintiffs incorporate the allegations in paragraphs 1-120 by reference as if fully set forth herein.

122.    Defendants have failed to carry out their mandatory and non-discretionary duties owed to Plaintiff, including the duties established in 8 U.S.C. § 1254a(b)(3).  28 U.S.C. § 1361.

123.    Defendants' failure to carry out their mandatory and non-discretionary duties owed to Plaintiffs is likely to irrevocably harm Plaintiffs and certain of their members.

## COUNT III
### (Declaratory Judgment, 28 U.S.C. § 2201)

124.    Plaintiffs incorporate the allegations in paragraphs 1-123 by reference as if fully set forth herein.

125.    For the reasons stated above, Defendants have violated the United States Constitution.

126.    Plaintiffs seek a declaratory judgment to that effect.

127.    Defendants' violations of the Constitution have injured and will continue to injure Plaintiffs and some of their members, including but not limited to stigmatic injury, which derives from, *inter alia*, the government's efforts to intentionally discriminate against Black immigrants to the United States, and DHS's efforts to link Haitians and/or Black immigrants to criminality and exploitation of public benefits.

128.    For the foregoing reasons, a live controversy exists between the Parties, and declaratory relief is appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court:

A.    Declare that Defendants' actions to rescind Haitian TPS are void and without legal force or effect;

B.    Declare that Defendants' actions to rescind Haitian TPS are in violation of the United States Constitution and contrary to the laws of the United States;

C.    Enjoin and restrain Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of them from implementing or enforcing the decision to rescind Haitian TPS and from taking any other action to rescind Haitian TPS that is not in compliance with applicable law;

D.    Issue a writ of mandamus compelling Defendants to carry out all nondiscretionary duties required by the United States Constitution, the INA, and any other applicable law with respect to the TPS program, including the requirements set forth above; and

E.    Provide any and all other relief to which Plaintiffs are entitled and that is necessary to remedy the legal violations set forth above, and any and all other relief the Court deems appropriate.

Respectfully submitted this 16th day of April, 2018.

/s/ Sherrilyn A. Ifill
Sherrilyn A. Ifill
D. Md. Bar No. 20072
        *Director-Counsel*
Janai Nelson*
Samuel Spital*
Jin Hee Lee*
Raymond Audain*
        *Counsel of Record*
Natasha C. Merle*
Deuel Ross*
Cara McClellan
D. Md. Bar No. 20047
Kristen Johnson*
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
40 Rector St., 5th Floor
New York, NY 10006
Tel.: (212) 965-2200
Fax.: (212) 226-7592
sifill@naacpldf.org

Ajmel Quereshi
D. Md. Bar No. 28882
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
1444 I Street NW
Washington, DC 20005
Tel.: (202) 682-1300
Fax.: (202) 682-1312
aquereshi@naacpldf.org

Bradford M. Berry**
Janette M. Louard**
Anson Asaka**

Khyla Craine
D. Md. Bar No. 14117
NATIONAL ASSOCIATION FOR THE
    ADVANCEMENT OF COLORED PEOPLE,
    INC.
Office of General Counsel
4805 Mount Hope Drive
Baltimore, Maryland 21215
Tel.: (410) 580-5777
bberry@naacpnet.org

*Appearing pro hac vice*

**Application for appearance pro hac vice*
    *forthcoming*

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 16, 2018, I filed the foregoing FIRST AMENDED COMPLAINT electronically via the Court's CM/ECF system, which will send a copy to all counsel of record.

/s/ Sherrilyn A. Ifill
Sherrilyn A. Ifill
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
40 Rector St., 5th Floor
New York, NY 10006
Tel.: (212) 965-2200
Fax.: (212) 226-7592
sifill@naacpldf.org