IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MARYLAND

NATIONAL ASSOCIATION FOR THE        :
ADVANCEMENT OF COLORED PEOPLE,
*et al*.                            :

      v.                            :   Civil Action No. DKC 18-0239

                                    :
UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, *et al*.         :

                       **MEMORANDUM OPINION**

     This is one of several recent cases challenging the decisions to end Temporary Protected Status ("TPS") for nationals of various countries. See, *Centro Presente v. Dep't of Homeland Sec'y*, No. 18-cv-10340-DJC (D.Mass. filed February 22, 2018)(Haiti, El Salvador, and Honduras); *Ramos v. Nielson*, No. 18-cv-1554-EMC (N.D.Cal. filed March 12, 2018)(Haiti, Sudan, El Salvador, and Nicaragua); *Saget v. Trump*, No. 18-cv-1599-WFK (E.D.N.Y. filed March 15, 2018)(Haiti); *Casa De Maryland, Inc. v. Trump*, No. 18-cv-845-GJH (D.Md. filed March 23, 2018)(El Salvador); and *Bhattarai v. Nielsen*, No. 19-cv-731-EMC (N.D.Cal. filed February 10, 2019)(Honduras and Nepal). While not entirely uniform in their reasoning, district court decisions reject challenges to subject matter jurisdiction, and find at least some of the complaints to state viable claims, both statutory and constitutional. As a result of the decisions already produced by those courts, the analysis here need not be extensive.

## I. Factual Background[1]

Plaintiffs, the National Association for the Advancement of Colored People ("NAACP"), Haitian Women for Haitian Refugees ("HWHR"), and the Haitian Lawyers Association, Inc. ("HLA"), seek declaratory relief and to enjoin the November 2017 decision of Defendants, the U.S. Department of Homeland Security ("DHS"), former acting DHS Secretary Elaine C. Duke ("Duke"), and current DHS Secretary Kristjen Nielsen ("Nielsen"), terminating Temporary Protected Status ("TPS") for Haitian nationals based on alleged Due Process and Equal Protection violations. Plaintiffs argue that Defendants' decision "reflects an egregious departure from the TPS statute's requirements and an intent to discriminate on the basis of race and/or ethnicity." (ECF No. 30 at 1).

The Amended Complaint contains three counts. Count I asserts a violation of the Fifth Amendment, both equal protection (intent to discriminate against Haitian immigrants because of race and/or ethnicity) and due process (irrational government action). Counts II and III seek mandamus and declaratory relief, respectively.

Section 244(c)(2) of the Immigration and Nationality Act ("INA"), codified in 8 U.S.C. § 1254a, allows the Secretary of

---

[1] Unless otherwise noted, the facts outlined here are set forth in the amended complaint and construed in the light most favorable to Plaintiffs.

Homeland Security ("Secretary")[2] to designate Temporary Protected Status ("TPS") for a country under certain conditions, for example: (i) if "there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected," or (ii) if the Secretary finds that a country is temporarily unable to handle the return of its nationals. 8 U.S.C. § 1254a(b)(1)(B)(i)-(ii). The TPS designation protects nationals of that country from removal while the designation is in effect, and allows them to hold a registration document and obtain work authorization in the United States. *Id.* § 1254a(a).

The Secretary has the discretion to designate TPS for an initial period of 6 to 18 months. *Id.* § 1254a(b)(2). After the allotted time has expired, the Secretary is required to review the conditions in the foreign state and determine whether to renew its TPS status. *Id.* § 1254a(b)(3)(A). A renewal may extend the designation for up to 18 months. *Id.* § 1254a(b)(3)(C). If the Secretary determines the conditions no longer warrant TPS, she must terminate the designation. *Id.* § 1254a(b)(3)(B). The Secretary must publish renewal and termination decisions in the Federal Register. *Id.* § 1254a(b)(3).

---

[2] The authority to designate countries under TPS was transferred from the Attorney General to the Secretary of Homeland Security in 2003. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002); 8 U.S.C. § 1103.

Haiti received an 18-month TPS designation in January 2010, after an earthquake "destroyed most of the capital city" and caused numerous deaths in 2010. (ECF No. 30 ¶ 21). Different administrations later extended the designation in May 2011, October 2012, March 2014, and August 2015. (*Id.* ¶¶ 23, 28, 33, 38). Each respective Secretary supported the extensions with a discussion of Haiti's country conditions, including continuing impacts from the 2010 earthquake, multiple cholera outbreaks resulting from a breakdown in healthcare infrastructure, breakdowns in law enforcement and government stability, lack of access to basic health services, a high unemployment rate, and compromised food security, among other issues. (*Id.* ¶¶ 24-46).

After President Trump took office, then-DHS Secretary John Kelly extended the TPS designation for six months, from July 23, 2017 to January 22, 2018. (*Id.* ¶ 51). Although he found the country conditions in Haiti to be severe enough to warrant a shorter TPS renewal, he signaled the administration's intent to terminate the TPS designation soon. (*Id.* ¶ 55).

On November 20, 2017, in the face of strong political support to the contrary, then-acting Secretary Duke announced her decision to terminate TPS for Haiti with a delayed effective date of 18 months.[3] (*Id.* ¶ 74). Her press release stated that the

---

[3] The following people and organizations offered political support for continued TPS designation for Haiti: numerous members

4

extraordinary conditions caused by the 2010 earthquake no longer existed. (*Id.* ¶ 75). She later published her decision as a Notice in the Federal Register. *See* Termination of the Designation of Haiti for Temporary Protected Status, 83 Fed. Reg. 2,648 (Jan. 18, 2018). The Notice was published four days before the TPS designation was set to expire. Plaintiffs allege that the "unprecedented delay" caused uncertainty and economic losses for Haitians living in the United States, including loss of jobs and certain federal benefits. (*Id.* ¶ 76).

Plaintiffs seek to enjoin Defendants from implementing the TPS termination decision and to secure declaratory relief that the decision is a violation of Due Process and Equal Protection rights. (*Id.* ¶¶ 46). Plaintiffs contend that the decision was not based upon objective evidence but was intended to discriminate against Haitian immigrants on the basis of race and/or ethnicity.

Plaintiffs claim to have circumstantial and direct evidence, including (1) alleged DHS targeted searches for evidence that Haitians with TPS in the United States were criminals and recipients of public welfare, (ECF No. 30 ¶¶ 87-88); (2) President

---

of Congress (in various bipartisan letters), the Massachusetts Congressional Delegation, the U.S. Chamber of Commerce, the Congressional Black Caucus, Governor Baker of Massachusetts, the National Haitian-American Elected Officials Network, the U.S. Conference of Catholic Bishops, and NYU Law School. (*Id.* ¶¶ 57-72). Haiti's government also submitted a formal request to extend its TPS status, and its Ambassador and Foreign Minister met with DHS to discuss extending the designation. (*Id.* ¶¶ 60, 73).

5

Trump's alleged comments that Haitians "all have AIDS" and "Why do we need more Haitians?" and the alleged order to drafters of the immigration bill to "take [Haitians] out," (*id.* ¶¶ 96-98); (3) President Trump's alleged question in response to Haitian immigrants "Why are we having all these people from shithole countries come here?" (*id.*); (4) President Trump's alleged comments expressing a preference for immigrants from places like Norway, where the population is over 90 percent white, (*id.*); President Trump's comments about other minority races, (*id.* ¶¶ 90-95); (5) Secretary Duke's failure to acknowledge evidence of Haiti's troubling country conditions today, (*id.* ¶¶ 77-86); (6) the "unprecedented" delay in publishing the Notice in the Federal Register, (*id.* ¶ 76); (7) Secretary Duke's failure to consider all factors in the statutory mandate, (*id.* ¶ 80); and (8) influence from the presidential administration to pressure the Secretary to rescind Honduras's designation as part of a broader strategic goal on immigration, (*id.* ¶ 102).

## II. Procedural History

On April 17, 2018 Plaintiffs filed a first amended complaint. (ECF No. 30). Defendants filed a motion to dismiss for lack of jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1) and for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) on May 7, 2018. (ECF No. 36). Plaintiffs responded in opposition on June 7, 2018. (ECF No. 45). Defendants replied on June 27, 2018. (ECF No. 58).

Plaintiffs were granted leave to file a surreply (ECF No. 61) and did so on July 6, 2018 (ECF No. 62).

The issues are fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the reasons that follow, Defendants' motion will be denied in part and granted in part.

**III. Standard of Review**

Generally, "questions of subject matter jurisdiction must be decided 'first, because they concern the court's very power to hear the case.'" *Owens—Illinois, Inc. v. Meade*, 186 F.3d 435, 442 n.4 (4th Cir. 1999) (quoting 2 James Wm. Moore *et al.*, Moore's Federal Practice § 12.30[1] (3d ed. 1998)). The plaintiff bears the burden of proving that subject matter jurisdiction properly exists in the federal court. *Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999). In a 12(b)(1) motion, the court "may consider evidence outside the pleadings" to help determine whether it has jurisdiction over the case before it. *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991); *see also Evans*, 166 F.3d at 647. There are two ways to present a 12(b)(1) motion to dismiss. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). "A defendant may either contend (1) that the complaint fails to allege facts upon which subject matter jurisdiction can be based; or (2) that the jurisdictional facts alleged in the complaint are

untrue." *Id.* The court should grant the 12(b)(1) motion "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Richmond*, 945 F.2d at 768. When a defendant makes a facial challenge to subject matter jurisdiction, as Defendants do here, "the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." *Adams*, 697 F.2d at 1219. "In that situation, the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).

Second, Defendants' argument that the complaint fails to state a plausible claim for relief is governed by Fed.R.Civ.P. 12(b)(6). The purpose of a motion to dismiss under Rule 12(b)(6) is to test the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). A plaintiff's complaint need only satisfy the standard of Rule 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007). That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement."

8

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). At this stage, all well-pleaded allegations in a complaint must be considered as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and all factual allegations must be construed in the light most favorable to the plaintiff, *see Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)).

**IV. Analysis**

**A. Jurisdiction**

As in other cases, Defendants argue that the court lacks subject matter jurisdiction under 8 U.S.C. § 1254a(b)(5)(A), which provides that: "[t]here is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state" for TPS relief. (ECF No. 36, at 16). And, as in other decisions, that argument is rejected.

There is a "'strong presumption' in favor of judicial review when [courts] interpret statutes." *Cuozzo Speed Techs., LLC v. Lee*, 136 S.Ct. 2131, 2140 (2016) (quoting *Mach Mining, LLC v. EEOC*, 135 S.Ct. 1645, 1650-51 (2015)). Furthermore, "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Webster v. Doe*, 486 U.S. 592, 603 (1988) (citing *Johnson v. Robison*, 415 U.S. 361, 373-74 (1974)).

Congress's intent must be clear because "[i]t is presumed that Congress legislates with knowledge of [the Court's] well-settled presumption favoring interpretations that allow judicial review[.]" *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991). The presumption in favor of judicial review may be overcome "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent." *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967) (citations omitted). Such indications may be "drawn from 'specific language,' 'specific legislative history,' and 'inferences of intent drawn from the statutory scheme as a whole,' that Congress intended to bar review." *Cuozzo*, 136 S.Ct. at 2140 (quotation omitted). Interpreting a statutory provision to eliminate any judicial review of constitutional claims raises serious questions as to separation of powers as well as constitutional concerns. *See Webster*, 486 U.S. at 603 (explaining that a "heightened showing" of Congressional intent is required "in part to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim"); *see also Johnson*, 415 U.S. at 366-67 (holding that, before interpreting a statute to strip federal courts of jurisdiction over constitutional challenges, which would "raise serious questions concerning the constitutionality" of that statute, the court would "first

ascertain whether a construction of the statute is fairly possible by which the (constitutional) question(s) may be avoided").

"The 'first step' of statutory interpretation 'is to determine whether the language at issue has a plain and unambiguous meaning' by looking to 'the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" *Orquera v. Ashcroft*, 357 F.3d 413, 418 (4th Cir. 2003) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340–41 (1997)). When the words of the statute are "sufficient in and of themselves to determine the purpose of the legislation" and do not produce unreasonable results "plainly at variance with the policy of the legislation as a whole," courts must follow their plain meaning. *United States v. Am. Trucking Ass'ns*, 310 U.S. 534 (1940) (quoting *Ozawa v. United States*, 260 U.S. 178, 194 (1922)). Indeed, "[t]here is . . . no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes." *Am. Trucking Ass'ns*, 310 U.S. at 543.

The text of 8 U.S.C. § 1254a(b)(5)(A) precludes judicial review of "any *determination*" made by the Secretary "with respect to the designation, or termination or extension of a designation" of TPS for a foreign state. Although the statute does not define "determination," Judge Chen correctly concluded that it is clear from the statutory text that "determination" refers to the

"designation," "termination," or "extension" of any TPS designation. *Ramos v. Nielsen*, 321 F.Supp.3d 1083, 1102 (N.D.Cal. 2018). Thus, the decision to terminate TPS for Haiti would be encompassed within the statutory bar, the "determination" challenged here as unconstitutional.

Even when statutory language would seem to preclude judicial review, however, constitutional claims remain within a court's subject matter jurisdiction if there is no "clear and convincing" evidence that Congress intended to preclude judicial review of colorable constitutional challenges to 1254a(b)(5)(A). *See Trump v. Hawaii*, 138 S.Ct. 2392, 2424 (2018) (Kennedy, J., concurring) ("There are numerous instances in which the statements and actions of Government officials are not subject to judicial scrutiny or intervention. That does not mean those officials are free to disregard the Constitution and the rights it proclaims and protects."). Where Congress intends to preclude review of all constitutional claims in the INA, it has said so explicitly. *See, e.g.,* 8 U.S.C. § 1252(b)(9) ("Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien . . . shall be available only in judicial review of a final order under this section"); *see also McNary*, 498 U.S. at 494 ("had Congress intended the limited review provisions of § 210(e) of the INA to encompass

challenges to INS procedures and practices, it could easily have used broader statutory language."). 8 U.S.C. § 1254a(b)(5)(A) does not prohibit, as do other statutes within INA, judicial "review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions," nor does 1254a(b)(5)(A) contain any similarly restrictive language. Plaintiffs' claim is a constitutional challenge to the Secretary's determination, which the scope of 8 U.S.C. § 1254a(b)(5)(A) does not clearly prohibit. *Centro Presente*, 332 F.Supp 3d at 407; *Ramos*, 321 F.Supp. 3d at 1105-06; *Casa de Maryland*, --- F.Supp. 3d---, 2018 WL 6192367, at *8 (D.Md. November 28, 2018); *Saget v. Trump*, 345 F.Supp.3d 287, 296 (E.D.N.Y. 2018). Therefore, this court has jurisdiction to hear Plaintiffs' constitutional claim.

**B. Failure to State a Claim**

Plaintiffs allege that Defendants' termination of TPS violates the Fifth Amendment to the United States Constitution because the decision was an irrational government action and was motivated, at least in part, by racial or national-origin animus. Defendants contend that the Secretary's decision is subject to deferential rational basis review and that Plaintiffs' complaint does not state a plausible claim for relief under this standard. Defendants also argue that Plaintiffs' complaint is facially deficient because equal protection claims necessitate comparator evidence of an individual who is similarly situated but treated

13

differently. Without directly confronting President Trump's alleged statements, Defendants argue the President's alleged animus is irrelevant because President Trump's statements are not attributable to the Secretary of Homeland Security.

1.  *Level of Scrutiny*

Defendants argue that the proper level of scrutiny for this claim is rational basis review, and rely on *Trump v. Hawaii*, 138 S.Ct. 2392 (2018), for support.[4] Defendants' reliance is misplaced. As aptly explained by various trial judges, the distinguishing factors include the absence of national security concerns and the presence of foreign nationals in the United States in this case. *See, e.g., Casa de Maryland*, 2018 WL 6192367, at *10; *Saget*, 345 F.Supp.3d at 301-02; and *Ramos*, 321 F.Supp.3d at 1129.

Instead, *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), provides the proper legal framework to determine whether the government's decision truly was motivated by impermissible animus.[5] If it is proven that the

---

[4] Defendants' also argue that rational basis review is appropriate, in line with cases involving immigration classification. It is true that some courts have applied rational basis review to immigration classifications; however, this case does not concern an immigration classification decision. Rather, this case concerns a constitutional challenge to an alleged racially discriminatory decision by the government.

[5] Contrary to Defendants' assertion, *Arlington Heights*, and not *Reno v. Am.-Arab Anti-Discrimination Comm. ("AADC")*, 525 U.S.

14

government's decision was motivated by impermissible race or national origin discrimination, the action is presumptively invalid and will only be upheld if the action is narrowly tailored to achieve a compelling government purpose. Under this standard, it is appropriate to look behind the stated reasons for government action into circumstantial evidence to find proof of discriminatory motivation, including:

> • a decision's historical background "if it reveals a series of official actions taken for invidious purposes";
>
> • "[t]he specific sequence of events leading up [to] the challenged decision";
>
> • "[d]epartures from the normal procedural sequence";
>
> • "[s]ubstantive departures . . . particularly if the factors usually considered important by

---

471 (1999), provides the proper framework in this case. The *AADC* standard necessitating a finding of "outrageous" discrimination in the immigration context is limited to individual challenges to the exercise of prosecutorial discretion, and does not apply to programmatic challenges. *Ramos*, 321 F.Supp.3d at 1125-26 (citing *Kwai Fun Wong v. U.S.*, 373 F.3d 952, 970 (9th Cir. 2004) ("Importantly, the *AADC* standard confining discrimination claims to 'outrageous' cases is limited to challenges to the exercise of prosecutorial discretion, *i.e.*, the 'discretion to choose to deport one person rather than another.'"); *see also Kandamar v. Gonzales*, 464 F.3d 65 (1st Cir. 2006) (rejecting application of the *AADC* test for outrageous animus to a programmatic challenge to the NSEERS program); *see also Hadayat v. Gonzales*, 458 F.3d 659 (7th Cir. 2006) (applying *AADC* to a programmatic attack because the claim arose in the context of an individual's removal who contended "he was unconstitutionally targeted for registration and removal based on his ethnicity and religion.").

> the decisionmaker strongly favor a decision contrary to the one reached"; and,
>
> • "[t]he legislative or administrative history . . . especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports."

*Arlington Heights*, 429 U.S. at 267-68 (citations/references omitted). This is a non-exhaustive list, and should be examined as a whole to avoid "consider[ing] [] each piece of evidence in a vacuum," so that the "forest" does not go unnoticed "in carefully surveying the many trees." *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 214 (4th Cir. 2016). Defendants contend that Plaintiffs' claim must fail, however, and that no evaluation of discrimination is needed, because they have not identified any similarly situated individuals who were treated differently, *see Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). Under the analysis provided in *Arlington Heights*, no comparator evidence is needed. *See Washington v. Davis*, 426 U.S. 229, 239-40 (1976) ("The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race. It is also true that the Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups."); *see also Bryant v. Aiken Reg'l Med. Centers Inc.*, 333 F.3d 536, 545–46 (4th Cir. 2003) ("We would never hold, for example, that an employer who

16

categorically refused to hire black applicants would be insulated from judicial review because no white applicant had happened to apply for a position during the time frame in question."). Other courts agree: *Ramos*, 321 F.Supp.3d at 1124-25, *Casa de Maryland*, 2018 WL 6192367, at *9 n.7; *Saget*, 345 F.Supp.3d at 301.

Plaintiffs have not alleged any direct statements of animus by Acting Secretary Duke or Secretary Nielsen. Rather, Plaintiffs rely on statements allegedly made by President Trump during his candidacy and Presidency. Defendants claim that a lack of any statement by either Secretary is the crucial link missing from the chain of racial animus which warrants dismissal. Defendants are incorrect. Even if it cannot be proven that Acting Secretary Duke or Secretary Nielsen personally harbor animus towards TPS-beneficiaries from Haiti, their actions may violate the equal protection guarantee if President Trump's alleged animus influenced or manipulated the decision-making process. For example, in *Hill v. Lockheed Martin Logistics Management, Inc.*, 354 F.3d 277, 290-91 (4th Cir. 2004) (en banc), the Fourth Circuit held that courts "do not limit the discrimination inquiry to the actions or statements of formal decisionmakers[,]" because such a limitation would "thwart the very purposes of the [anti-discrimination] acts by allowing employers to insulate themselves from liability simply by hiding behind the blind approvals, albeit non-biased, of formal decisionmakers." Influential racial animus

17

principles in the employment context apply with full force to government officials' alleged constitutional violations, even the President. *See Ramos*, 321 F.Supp.3d at 1124 ("There is no logical reason why this principle should not apply with equal force when the superior entity or authority (here, the President) influences a subordinate (here, a cabinet member) to perform an action charged to the latter."); s*ee also Batalla Vidal v. Nielsen*, 291 F.Supp.3d 260, 279 (E.D.N.Y. 2018) (holding that "[i]f, as Plaintiffs allege, President Trump himself directed the end of the DACA program, it would be surprising if his 'discriminatory intent [could] effectively be laundered by being implemented by an agency under his control'") (quotation omitted). The dispositive question here is whether the challenged decision was motivated by impermissible animus. Defendants appear to concede that the White House may have been involved in the termination decision, (ECF No. 36, at 29) ("it should be considered unremarkable that a White House advisor would provide input to the Secretary of Homeland Security on a politically sensitive matter of this nature"), and thus do not reject the possibility of a "cats' paw" theory of animus. Instead, Defendants argue that because Acting Secretary Duke did not immediately terminate TPS status for another country, Honduras, at the behest of the White House, that she is resistant to the administration's pressures. (*Id.;* ECF No. 58, at 15). However, Defendants ignore that Honduras' TPS status was later

rescinded by Acting Secretary Duke, that inaction or delay could reasonably not be seen as "resistance," and importantly fail to distinguish the power of President Trump's alleged statements of animus specifically targeting Haiti. Even if it is arguable that Acting Secretary Duke's delay was a "resistance," or that President Trump's statements did not influence the TPS decision, at the motion to dismiss stage all factual allegations must be accepted as true and construed in the light most favorable to the plaintiffs.

Accordingly, Plaintiffs' complaint alleges a plausible claim for relief.

**V.  Mandamus and Declaratory Judgment**

Plaintiffs' allege they are entitled to mandamus relief because Defendants' have failed their mandatory and nondiscretionary duties set forth in 8 U.S.C. § 1254a(b)(3). Defendants' contend that Plaintiffs' claims do not meet the narrow criteria for mandamus relief. Mandamus relief is "intended to provide a remedy for a plaintiff only if he has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty." *Heckler v. Ringer*, 466 U.S. 602, 616 (1984). Plaintiffs' have a direct cause of action by way of the Constitution, including for injunctive relief. *See, e.g., Bell v. Hood*, 327 U.S. 678, 684 (1946). Thus, Plaintiffs' have not exhausted all other avenues of relief. Similarly, the Declaratory

Judgment Act provides a mode of relief, and is not an independent cause of action. To the extent that Plaintiffs seek full relief under Count I, there is no need to resort to Count III for declaratory relief. Accordingly, both Counts II and III will be dismissed.

**VI. Amicus Brief**

Two amicus briefs have been filed, both with consent of the parties. The pending motion for leave, ECF No. 56, will be granted.

**VII. Conclusion**

For the foregoing reasons, the motion to dismiss filed by Defendants will be denied as to Count I and granted as to Counts II and III. A separate order will follow, and a telephone scheduling conference will be arranged. The cases cited at the outset of this opinion are at varying stages of litigation, and counsel should be prepared to discuss whether this case presents any unique issues.

                                                  /s/
                             DEBORAH K. CHASANOW
                             United States District Judge